[No. H027980. Sixth Dist. Apr. 10, 2006.]

CALIFORNIA STATE AUTOMOBILE ASSOCIATION
INTER-INSURANCE BUREAU, Plaintiff and Appellant, v.
CITY OF PALO ALTO, Defendant and Respondent.

476

COUNSEL

Buresh, Kaplan, Jang & Feller, Alan J. Jang and Ramon M. Gonzalez for Plaintiff and Appellant.

Gary M. Baum, City Attorney, and William B. Mayfield, Assistant City Attorney, for Defendant and Respondent.

OPINION

RUSHING, P. J.—In this case, California State Automobile Association Inter-Insurance Bureau (CSAA) appeals a judgment following a court trial in which the court found respondent City of Palo Alto (City) was not liable for property damage resulting from a sewage backup into a private home under the theory of inverse condemnation.

### STATEMENT OF THE FACTS AND CASE

CSAA is the homeowners' insurance carrier for David and Suzanne McKenna for their residence located on Maybell Way in the City of Palo Alto. The McKennas suffered property damage as a result of two separate raw sewage backups into their home that occurred over a two-month period in 2001. CSAA paid the McKennas' claims, and subsequently brought an

action as subrogee against the City under theories of inverse condemnation, trespass, nuisance and premises liability.

The sewer main servicing the McKennas' property was constructed in approximately 1959 when the subdivision containing their home was developed, and consists of clay pipe segments six inches in diameter on the inside and joined in a bell and spigot design sealed with concrete packed into the bell ends of the pipe segments. The main begins from a manhole in the center of the cul-de-sac turnaround of Maybell Way and continues at another manhole located at the intersection of Maybell Way and Maybell Avenue. The slope of the main is .455 percent. The McKennas' sewage is carried away from their home via a lateral sewer pipe, four inches in diameter, that connects to the main sewer pipe in the center of the street.

On November 6, 2001, the McKennas' sewer line backed up, causing raw sewage to enter their home. As a result, the home was damaged extensively, and the McKennas temporarily moved out until repairs could be completed. On the day of the backup, CSAA retained Express Plumbing, which did a video inspection and found that the backup was caused by tree root intrusion in the sewer lateral located on the McKennas' property. The existing lateral was porous clay material that allowed the tree root intrusion. CSAA authorized Express Plumbing to replace the McKennas' portion of the lateral, which extends from the house to the sidewalk, as well as the City's portion of the lateral that extends from the sidewalk to the main sewer line under the street. The replacement of the City's portion was completed on November 20, 2001, after Express Plumbing received the necessary permits. The replaced lateral was constructed of nonporous polyethylene pipe, and consisted of a single piece of pipe with no joints or connections except at the ends.

On December 4, 2001, after the repairs were complete, the McKennas moved back into their home. Almost immediately thereafter, the home was again flooded with raw sewage. CSAA hired Spectrum Leak Locators (Spectrum) to investigate the cause of the backup. Spectrum conducted a video inspection and found the replaced lateral pipe to be clear of debris and in "perfect" condition. Spectrum found that a day after the December 4th sewage backup, there were tree roots intruding into the City's "wye"[1] joint connecting the McKennas' lateral to the City's main. The video inspection also revealed that there was toilet paper and effluent on the tree roots in the main, and that the main was half filled with standing water, with tree roots penetrating at every eight-foot joint.

Following payment of the McKennas' claims for property damage resulting from the second sewage backup in December 2001, CSAA filed suit as

[1] From the record we understand this word "wye" to describe the shape of a plumbing fitting that looks like the letter "Y."

subrogee of the McKennas in an action against the City under theories of inverse condemnation, trespass, nuisance and negligence. CSAA did not request reimbursement for the payments it made in regard to the November 2001 backup; rather, it claimed the City was liable only for the second backup that occurred in December 2001. Both sides waived jury, and the matter was tried before the court.

CSAA provided evidence of three potential causes of the sewage backup that occurred in December 2001. The three possible causes were (1) the existence of tree roots invading the porous clay pipe of the sewer main as observed by the video inspection conducted by Spectrum; (2) the .455 percent slope of the main that CSAA's plumbing expert testified was insufficient to effectively carry sewage away from homes; and (3) the existence of standing water filling one half of the main, as observed by video inspection one day after the December 2001 backup.

The City presented evidence that its maintenance program for the sewer main was to hydroflush it every two years. This process involves the use of a hose with high-pressure water to scour the inside of the pipe, removing all invading tree roots. The sewer main on Maybell Way was hydroflushed on June 28, 2000, one and a half years prior to the November 2001 backup, and had a regular schedule of being hydroflushed every two years going back to 1983.

The evidence presented at trial demonstrated that the only sewage overflows that occurred on Maybell Way were to the McKenna home in November and December 2001; there was no evidence of any prior or subsequent sewer overflows into residences on Maybell Way.

At the conclusion of the court trial, the court ruled in favor of the City. In its statement of decision, the court found that although the sewage backup was caused by a blockage in the City's sewer main, CSAA failed to prove "how or why any such blockage in the City's main occurred." (Original underscoring.)

CSAA filed a timely notice of appeal.

### DISCUSSION

CSAA asserts on appeal that the trial court erred in requiring it to prove fault in its inverse condemnation action against the City for causing the damage to the McKennas' home.

In this case, both parties agree that all three standards of appellate review apply. CSAA's claim that the trial court misapplied the California Constitution and required it to prove negligence in its inverse condemnation action is

a question of law, and will be reviewed de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].) With regard to CSAA's remaining claims that there was insufficient evidence presented at trial to support the trial court's judgment in favor of the City, and that the trial court erred in disregarding its evidence regarding the causation of the blockage in the City's main, we will apply the substantial evidence and abuse of discretion standards of review respectively. (See *Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58].)

■ Under the California Constitution, article I, section 19, property may not be taken or damaged for public use without just compensation to the owner. This provision is the authority for both proceedings initiated by the public entity to "take[]" property—otherwise known as "eminent domain"—and those initiated by the property owner for just compensation as a result of a taking—otherwise known as "inverse condemnation." (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 529 [86 Cal.Rptr.2d 473].)

■ A property owner may recover just compensation from a public entity for "any actual physical injury to real property proximately caused by [a public] improvement as deliberately designed and constructed . . . whether foreseeable or not." (*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 263–264 [42 Cal.Rptr. 89, 398 P.2d 129] (*Albers*); see *Holtz v. Superior Court* (1970) 3 Cal.3d 296, 303 [90 Cal.Rptr. 345, 475 P.2d 441].) Inverse condemnation lies where damages are caused by the deliberate design or construction of the public work; but the cause of action is distinguished from, and cannot be predicated on, general tort liability or a claim of negligence in the maintenance of a public improvement. (*Hayashi v. Alameda County Flood Control* (1959) 167 Cal.App.2d 584, 591–592 [334 P.2d 1048]; *Yox v. City of Whittier* (1986) 182 Cal.App.3d 347, 352 [227 Cal.Rptr. 311] (*Yox*); see, e.g., *Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 382 [41 Cal.Rptr.2d 658, 895 P.2d 900] [a public entity cannot be subject to " 'general tort liability under the theory of eminent domain' "].) But damage caused by the public improvement as deliberately conceived, altered, or maintained may be recovered. (*Barham v. Southern Cal. Edison Co.* (1999) 74 Cal.App.4th 744, 754 [88 Cal.Rptr.2d 424].)

■ To be compensable, the taking must be for a public use. (Cal. Const., art. 1, § 19; *Yox, supra*, 182 Cal.App.3d at p. 352.) Indeed, the policy basis for the payment of just compensation is a consideration of " 'whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.' " (*Albers, supra*, 62 Cal.2d at p. 262.) For purposes of inverse condemnation, "public use" is that which "concerns

the whole community or promotes the general interest in its relation to any legitimate object of government." (*Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345, 358 [28 Cal.Rptr. 357].)

Here, there is no dispute as to three of the elements of the inverse condemnation: (1) the McKennas owned the real property that was damaged by the sewage backup; (2) the McKennas' property was taken or damaged; and (3) the City's sanitary sewer drain system was a public project. The issue in this case is as to the fourth element of proximate causation.

At the heart of the dispute here is the requirement as set forth in *Albers* that the property damage must be "proximately caused by [a public] improvement as deliberately designed and constructed . . . whether foreseeable or not." (*Albers, supra,* 62 Cal.2d at pp. 263–264.) The City argues at length that simply because a blockage occurred in the main does not in itself establish liability under a theory of inverse condemnation. Rather, CSAA must prove that "the public improvement which, as designed, constructed and maintained presents an inherent risk of damage to private property, and the inherent risks materialize to cause damage." (See *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 607 [96 Cal.Rptr.2d 897].)

While the City focuses primarily on the language of *Albers*, and its requirement that liability under a theory of inverse condemnation will attach only if damage is caused by the public work as "deliberately designed and constructed" (*Albers, supra,* 62 Cal.2d at pp. 263–264), CSAA cites the case of *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550 [253 Cal.Rptr. 693, 764 P.2d 1070] (*Belair*), which was decided by our Supreme Court subsequent to *Albers*, and serves to further define and clarify the element of proximate causation. In *Belair*, the court noted, "After our decision in *Albers*, Professor Arvo Van Alstyne authored a seminal article on inverse condemnation liability in which he observed that *Albers's* proximate cause requirement 'involves a troublesome conceptual premise.' (Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 435–438.) Our decision in *Albers, supra,* 62 Cal.2d 250, contained the seeds of confusion through its combination of 'proximate cause' terminology with the elimination of foreseeability as an element of inverse condemnation. Noting this paradox, Professor Van Alstyne suggested that the true measure of proximate cause should be stated in terms of a ' "substantial" cause-and-effect relationship [which] exclude[es] the probability that other forces *alone* produced the injury.' " (*Belair,* at pp. 558–559.)

In further defining the element of proximate cause taking into consideration Professor Van Alstyne's suggestions, the *Belair* court noted that "several Court of Appeal decisions [have] held that inverse condemnation liability

may be established where the public improvement constitutes a substantial cause of the damage, albeit only one of several concurrent causes." (*Belair, supra,* 47 Cal.3d at p. 559.) The *Belair* court cited a number of Court of Appeal cases as examples, and specifically discussed *Ingram v. City of Redondo Beach* (1975) 45 Cal.App.3d 628, 633–634 [119 Cal.Rptr. 688] (*Ingram*). In *Ingram* the plaintiffs sued the defendant city for damages incurred when heavy rains caused the earthen wall of a drainage sump to collapse, allowing water to flood the plaintiffs' homes. (*Id.* at pp. 630–631.) The trial court granted judgment for the city, finding that " '*no damages to plaintiff occurred as a proximate result of any public improvement of defendant . . . .*' " (*Id.* at p. 630.)

Relying on the "substantial cause" theory as suggested by Professor Van Alstyne, and endorsed by our Supreme Court, the Court of Appeal reversed, stating: "There is no controversy over the fact that the wall of the sump gave way, releasing a flood onto plaintiffs' properties. This clearly could be a *substantial factor* in causing the claimed damages." (*Ingram, supra,* 45 Cal.App.3d at p. 633, italics added.)

■ After *Belair,* the element of proximate causation for inverse condemnation is established if the plaintiff can prove " ' "a substantial cause-and-effect relationship excluding the probability that other forces *alone* produced the injury." ' " (*Belair, supra,* 47 Cal.3d at p. 559.) Even where an independent force contributes to the injury, the public improvement remains a substantial concurrent cause if "the injury occurred in substantial part because the improvement failed to function as it was intended." (*Id.* at pp. 559–560.) The public improvement is a substantial cause unless "the damage would have occurred even if the project had operated perfectly." (*Id.* at p. 560.) A public improvement is a "substantial concurring cause" if other forces alone would not have caused the damage and the public improvement failed to function as intended. (*Ibid.*)

In the statement of decision issued after the trial, the court found that although CSAA had proved that the blockage that caused the sewage backup likely occurred in the sewer main owned and operated by the City, it also found that ". . . CSAA failed to prove . . . . how or why any such blockage in the City's main occurred." (Original underscoring.) CSAA asserts that in requiring it to show how or why the blockage occurred, the trial court erred by elevating the standard for inverse condemnation from strict liability, where no fault need be shown, to a negligence or fault-based action. CSAA further asserts that by proving that a blockage occurred in the City's main, it by definition proved a failure of the City's public work, and the City would be "strictly liable for all property damage resulting from that blockage . . . ."

At trial, CSAA did not establish the specific cause of the sewage backup, but did present evidence of three different potential causes of the blockage in the main. Specifically, CSAA provided evidence that there were tree roots invading the porous clay pipe of the sewer main, the main itself was an inadequate slope to effectively carry sewage away from homes, and there was standing water in the main. CSAA asserts that any of these three factors could establish "how or why" the blockage occurred.

The trial court rejected CSAA's contention that tree root invasion was a potential cause of the blockage in the sewer main. While acknowledging that tree root invasion into the main was visible from the video inspection, the trial court found that the lack of any other sewage backups along Maybell Way, coupled with the City's hydroflushing records showing no significant problem with tree roots on Maybell Way, indicated that the blockage that caused the backup into the McKennas' homes was not the tree roots, but was temporary in nature, and quickly dissipated.

The trial court also rejected CSAA's argument that the sewer main was designed with an insufficient slope to adequately remove waste from home. The evidence at trial was undisputed that the sewer main along Maybell Way was one-half of 1 percent. CSAA's plumbing expert, Mark Hunter, testified that in his opinion, this slope was inadequate to flush sewage solids through gravity along the pipes. Hunter based his testimony on the design standards set forth in the Uniform Plumbing Code; however, these standards are not applicable to facilities such as the sewer main in this case located in the public right-of-way. The trial court concluded that based on the 40 years of its existence without backup problems, the sewer main along Maybell Way was not designed with an insufficient slope for sewage removal.

In addition to its finding that the tree roots and the slope were not the cause of the sewage backup here, the trial court also found that CSAA failed to prove that the City's maintenance and replacement program for the sewer pipes proximately caused the injuries in this case. The trial court cited *Pacific Bell v. City of San Diego, supra,* 81 Cal.App.4th 596, stating that unlike the defendants in that case who had a policy and practice of ignoring deterioration in facilities until damage occurred, the City here had a scheduled program of maintenance of the sewer pipes that cleaned the pipes and removed any invading tree roots on a regular basis. The court in *Pacific Bell* opined that the defendant's "wait until it breaks" approach to lower cost maintenance demonstrated a calculated risk of damage to the plaintiff's property, making it proper to require the public entity to bear the loss when the damage occurred. (*Id.* at p. 608.) Here, however, the City had a proactive approach to maintenance that the trial court concluded did not contribute to the sewage backup.

While the trial court found that neither tree roots nor inadequate slope caused the sewage backup into the McKennas' home, and that the City had a regular program of maintenance for the sewer, it also specifically found that the *blockage occurred in the main owned and operated by the City.* How or why the blockage occurred is irrelevant. The purpose of the sanitary sewer is to carry wastewater *away* from the residence. The City's sanitary sewer failed to carry wastewater away from the McKennas' residence *because* of a blockage in the City's main, and therefore, failed to function as intended.

■ The trial court's conclusion that CSAA failed to establish "how or why" the blockage occurred was clearly erroneous, because the court was focusing only on *which* of the three potential factors may have caused the injury, rather than whether *"the [public] improvement failed to function as it was intended . . . ,"* as stated in *Belair, supra,* 47 Cal.3d at page 560 (italics added). Here, by finding that the blockage occurred in the main, and the blockage caused sewage to back up into the McKennas' home, the trial court impliedly found that the public improvement failed to function as intended. Under the rationale of *Belair, supra,* 47 Cal.3d 550, the City should be liable under inverse condemnation.

In addition, by requiring CSAA to show "how and why" the blockage occurred, the trial court applied a higher standard of proof to its claim of inverse condemnation, requiring CSAA to prove tortious conduct on the part of the City. In citing the fact that the sewer main along Maybell Way had no history of sewage backups over 40 years it was in existence, and the fact that the City had a regular system of hydroflushing every two years that showed no history of tree root problems, the trial court was evaluating whether the City acted *reasonably* in the operation of its sanitary system or sewer system. However, whether or not the City acted reasonably or whether or not the McKenna sewage backup was foreseeable is completely irrelevant in determining if the City is liable under a theory of inverse condemnation.

We believe that where, as here, there were three substantial factors in causing the sewage backup, namely, tree roots invading the porous clay pipe of the sewer main, inadequate slope, and standing water in the main, the burden would shift to the public entity to produce evidence that would show that other forces alone produced the injury.

Any other result would have the effect of making the proof bar so high that a homeowner could *never* prevail against a city in a case such as this. The City urges that there may have been a momentary blockage that caused the backup in this case and then quickly dissipated. Yet the fact that a blockage is "momentary" does not lessen its ability to cause significant damage from a sewage backup. Moreover, if we accepted the City's assertion, we would

make it impossible to prove causation, because a momentary blockage would by definition be gone before a homeowner could conclusively prove "how or why" it occurred.

We do not mean to say, as CSAA urges, the City would be "strictly liable for all property damage resulting from the blockage . . . ." But here, where the new, nonporous lateral pipe installed by the homeowner was conclusively shown *not* to be the source of the blockage, it was error for the trial court to deem the proof of causation insufficient. The blockage occurred on City land and in piping strictly under the control of the City.

Our discussion should not be taken as converting an inverse condemnation claim into a solely strict liability concept. The homeowner here had the duty to demonstrate the actual cause of the damage to him. He did that. In finding the proof of causation insufficient because of a failure to establish the "how and why" of the blockage, the trial court asked for too much. In order to satisfy such a standard of proof, one would have to prove with particularity the actual mechanism of the backup. But our Constitution does not require that. It only requires proof of a substantial cause of the damage, indeed as was said by our Supreme Court in *Belaire*, " ' "a substantial" cause-and-effect relationship which excludes the probability that other forces *alone* produced the injury.' " (*Belair, supra,* 47 Cal.3d at p. 559.) In this case, there was a substantial cause and effect relationship between factors entirely within the City's control, namely, tree roots, slope and standing water in the main that contributed to the backup; there is no need to distinguish among them to specifically determine "how and why" the blockage occurred.

The City states in its brief that this case should be a "lesson" to CSAA that the insurance industry "cannot automatically expect public agencies to bail them out of insurance losses every time there is a sewer backup." This statement is surprising in light of the fact that the City is doing just that—expecting the insurance industry to pay for damages *caused by a blockage in its sewer main.*

What the City fails to recognize in this case is that CSAA did everything in its power to address the McKennas' plumbing issue, even going so far as to replace the entire lateral pipe from the McKennas' home to the City's sewer main, including the portion *owned and operated by the City.* There was nothing more CSAA could do to protect the homeowners from sewage backup. CSAA paid the costs to repair the portion of the lateral that was under the control of the homeowner, and did not claim that such costs were attributable to the City. CSAA should not also be required to pay the costs of damages as a result of a blockage in the City's main over which CSAA had no control.

## DISPOSITION

The judgment is reversed.

Premo, J., and Duffy, J., concurred.

Respondent's petition for review by the Supreme Court was denied July 19, 2006, S143559.