# IN THE SUPREME COURT OF CALIFORNIA

CITY OF OROVILLE,
Petitioner,
v.
THE SUPERIOR COURT OF BUTTE COUNTY,
Respondent;
CALIFORNIA JOINT POWERS RISK MANAGEMENT
AUTHORITY et al.,
Real Parties in Interest.

S243247

Third Appellate District
C077181

Butte County Superior Court
152036

August 15, 2019

Justice Cuéllar authored the opinion of the Court, in which
Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu,
Kruger, and Groban concurred.

CITY OF OROVILLE v. SUPERIOR COURT

S243247


Opinion of the Court by Cuéllar, J.


A dental practice suffered damage when raw sewage began spewing from the toilets, sinks, and drains of its building. The resulting damage triggered the inverse condemnation claim — an action to recover damages for injuries to private property caused by a public improvement — at the heart of this case. The dentists contend the City of Oroville (the City) is legally responsible for the property damage, because it was caused by the sewer system's failure to function as intended. According to the dentists, the failure was manifest when the system allowed sewage to back up into their building instead of siphoning the waste away from their private property. The City maintains the damage occurred because the dentists failed to install a legally-required backwater valve that would have prevented sewage from entering their building in the event of a sewer main backup.

What we conclude is that the Court of Appeal erred in finding the City liable in inverse condemnation. The appellate court reached this decision without addressing a fundamental question: whether the inherent risks associated with the sewer system — as deliberately designed, constructed, or maintained — were the substantial cause of the damage to the private property.

Public entities are not strictly or otherwise automatically liable for any conceivable damage bearing some kind of

1

connection, however remote, to a public improvement. To succeed on an inverse condemnation action, a plaintiff must ordinarily show — assuming the public entity made reasonable assumptions about the public improvement in question — that the damage to private property was substantially caused by inherent risks associated with the design, construction, or maintenance of the public improvement. That's certainly not something the dentists were able to show in this case, where installation of a backwater valve on their premises not only would have prevented or drastically mitigated the risk of damage, according to experts, but was legally required. Under the circumstances, the City is not liable in inverse condemnation, so we reverse the judgment of the Court of Appeal.

## I.

Raw, untreated sewage from the City of Oroville's sewer main backed up into a private sewer lateral in December 2009, invading the sinks, toilets, and drains of a local office building. Located at 3579 Oro Dam Boulevard, the building was owned by three dentists doing business as WGS Dental Complex. The dentists, individually and doing business as WGS Dental Complex (collectively WGS), filed claims against their insurer, The Dentists Insurance Company (TDIC). WGS sued the City for inverse condemnation (Cal. Const., art. I, § 19) and nuisance for losses it claimed were not covered by insurance. And TDIC filed a complaint in intervention for negligence, nuisance, trespass, and inverse condemnation. The City filed a cross complaint against WGS for its failure to ensure a backwater valve was properly installed on their private sewer lateral, alleging violation of the Oroville Municipal Code, public nuisance, strict liability, and negligence.

The City moved for summary judgment on WGS's claims, citing WGS's failure to install the backwater valve. WGS opposed the City's motion, asserting it had no role in constructing the building and was unaware of any issue with the backwater valve until the sewage backed up into the building and alleging the City's intentional plan of maintenance of the sewer main allowed a blockage to form. The trial court denied the City's motion, and stated, "[I]t appears that either prevention of the blockage or installation of the backflow prevention device could have prevented the damage. The relative importance of these two factors in causing the damage will be something for the trier of fact to decide."

WGS then sought judicial determination of the City's liability for inverse condemnation under Code of Civil Procedure section 1260.040 (section 1260.040), deferring the issue of damages.[1] After WGS and the City reasserted the positions advanced at summary judgment, the trial court took judicial notice of most of the documents submitted in the summary judgment proceedings. On July 25, 2014, the trial court found the City liable in inverse condemnation.

The City presented evidence that the sewer on Oro Dam Boulevard was built and operates as a gravity-driven system, in

---

[1] In *Weiss v. People ex rel. Dept. of Transportation* (2018) 20 Cal.App.5th 1156, review granted June 13, 2018, S248141, we granted review to address whether section 1260.040 may be properly used in inverse condemnation proceedings to determine — in advance of a bench trial — whether a taking or damaging of private property has occurred. That question is not in dispute here, so we need not decide in this case whether a section 1260.040 motion is a proper way to seek judicial resolution of an inverse condemnation claim.

which sewage flows downhill to a sewage treatment plant. Manholes provide points of access to the sewer main for maintenance and the sewer system is designed for sewage to escape through the manhole immediately upstream of a sewer main line blockage. WGS's private lateral sewage line connects to the main sewer line between manhole numbers JJ-10 and JJ-11. The City found evidence of a partial blockage in the sewer line between manholes JJ-10 and JJ-11 on December 29, 2009, the date of the sewage backup into the WGS building.

The City also submitted evidence that it enacted Oroville Ordinance No. 1450 in 1984, which adopted the 1982 Uniform Plumbing Code. This ordinance required property owners to install backwater valves on private sewer laterals where the fixtures on the property are lower than the elevation of the next upstream manhole of the public sewer. Backwater valves are installed to prevent sewage from entering buildings during sewer main line backups. WGS acquired its building when it was under construction in 1985, after the City enacted Oroville Ordinance No. 1450. In 1986, the City inspected the construction and issued a "Certificate of Occupancies" to the dentists. At the time of the sewage backup, WGS had no backwater valve installed on its private sewer lateral. According to the City's experts, the sewage that backed up in the sewer line between manholes JJ-10 and JJ-11 would have ordinarily spilled out of the next upstream manhole. Instead, on December 29, 2009, the sewage exited through the sink and toilet fixtures at WGS's offices because WGS had no backwater valve on its private sewer lateral.

WGS offered its own expert testimony. Its expert conceded that the sewage backup incident could have been averted if a fully functional backwater valve had been installed

4

on WGS's building. This expert further testified that backwater valves don't always work to perfection, because certain backwater valves can be inadvertently damaged during routine sewer cleaning, diminishing the valve's capacity.

After considering the evidence, the trial court found that WGS submitted sufficient evidence to establish the following facts: there was a blockage in the City's sewer main; the blockage was most likely caused by roots; the blockage resulted in sewage backup in WGS's offices; and the backup caused damage to WGS's property. The trial court stated these basic facts were not in dispute, and the only issue for determination on the section 1260.040 motion was the legal responsibility for the damage that resulted from the sewage backup.

The court then concluded that an inverse condemnation had occurred even though the City shared causal responsibility for the damage with WGS. The "primary cause of the blockage," the court found, was root intrusion in the sewer main and "a significant secondary cause of the damage" was WGS's failure to install a backwater valve on their private sewer lateral, "a necessary part of the sewer design and plan." Citing *California State Automobile Assn. v. City of Palo Alto* (2006) 138 Cal.App.4th 474 (*City of Palo Alto*), the trial court held it was constrained to find the City liable in inverse condemnation because one of the causes of damage was root blockage, which was described in *City of Palo Alto* as an inherent risk of sewer operation.

Petitioning the Court of Appeal for a peremptory writ of mandate, the City presented three arguments. First, the deliberate design and construction of the sewer system was not the cause of the damages. Second, WGS's failure to install and

maintain the legally required backwater valve defeated the deliberate design and construction of the sewer system. And third, the City claimed to have acted reasonably in operating and maintaining its sewer system.

WGS argued that the trial court was correct in finding the City liable in inverse condemnation. TDIC assigned its intervention rights to the California Joint Powers Risk Management Authority (the Authority), a risk-sharing pool comprised of public entities, including the City of Oroville. Appearing as a real party in interest, the Authority argued that although recovery for inverse condemnation would be in its financial interest in this case, it supported the City's position that inverse condemnation should not be available where sewage overflows onto private property because the landowner failed to have a backwater valve as required by law.

The Court of Appeal concluded that the trial court had correctly found the City liable in inverse condemnation. First, the Court of Appeal addressed the City's argument that the only reason sewage spilled into WGS's private property was WGS's failure to install and maintain a backwater valve, which defeated the design of the sewer system. Relying on *City of Palo Alto*, the Court of Appeal stated that in order to absolve itself of liability, the City would have to prove that other forces alone produced the injury. The Court of Appeal reasoned that, despite the City's argument to the contrary, a distinction existed between concluding that the backwater valve had the *capacity* to prevent the sewage backup from entering WGS's private property, and finding the absence of the backwater valve — alone — produced the injury. The Court of Appeal rejected the City's argument that the absence of the backwater valve assuaged or eliminated its liability, characterizing it as

reminiscent of a "sort of contributory negligence theory from tort law," in which WGS's conduct would preclude recovery from the City — a concept the Court of Appeal noted was no longer applicable even in tort law. Again relying on *City of Palo Alto*, the Court of Appeal concluded that even where an independent force contributes to the plaintiff's injury, the public infrastructure in question is a concurrent cause if the injury occurred in substantial part because the improvement failed to function as intended. The Court of Appeal reasoned that WGS's "failure to install a backup valve did not cause the blockage in City's sewer main."

Then the Court of Appeal turned to whether the sewer, as deliberately designed, caused damage to private property. The Court of Appeal stated that the City's sewer system was designed and constructed to overflow, if necessary, at the next upstream manhole and that the City acknowledged a sewer blockage was an inherent risk of the sewer system. But the Court of Appeal dismissed the City's argument that there was no inherent risk of backup into private property if the property owner installed a backwater valve, noting that if the backwater valve was a necessary component of the sewer design, perhaps the City should have ensured compliance with the law. The Court of Appeal concluded that WGS's failure to install the backwater valve did not defeat the inverse condemnation claims and affirmed the trial court's decision.

We granted review to address whether the City is liable in inverse condemnation where sewage backs up onto private property because of a blockage in the City's sewer main and the absence of a backwater valve that the affected property owner was legally required to install and maintain.

## II.

## A.

Sometimes the well-being of the public justifies the seizure of privately held property. But in our system of government, such private property "condemnation" for public use can only occur subject to certain conditions. Under article I, section 19 of the California Constitution (article I, section 19), a public entity must pay the owner just compensation when it takes or damages private property for public use. (Art. I, § 19, subd. (a) ["Private property may be taken or damaged for a public use and only when just compensation . . . has first been paid to . . . the owner"].) Used responsibly, the government's capacity to condemn private property for public use allows for a reasonable compromise between the public good and the protection of private citizens whose property is needed to advance that good. (*City of Oakland v. Oakland Raiders* (1982) 32 Cal.3d 60, 64.)

This "just compensation" clause in the California Constitution applies to the state's exercise of its eminent domain power, constraining it by requiring that when the state takes private property for public use, the private property owner is justly compensated. (*Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 376-377 (*Customer Co.*).) Where government does not recognize that a particular circumstance amounts functionally to a taking for public use or otherwise fails to pay the requisite compensation for the property in question, the property's owner can, as here, pursue an "inverse condemnation" action. (See *id.* at p. 377; see also *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 362.) So article I, section 19 provides the basis for two kinds of actions: a conventional eminent domain proceeding, instituted by a public entity to

acquire private property for public use; and an inverse condemnation action, initiated by a private property owner seeking compensation for a taking or damage to his or her property. (*Customer Co.*, at pp. 376-377.)

To resolve inverse condemnation claims and the causal questions they raise, courts have garnered insights from tort and property law doctrines relevant to analogous disputes between private parties. (See *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 439 (*Bunch*), citing *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 562 (*Belair*).) Supporting this approach was an understanding that inverse condemnation is not a distinct cause of action, but instead a remedy for an already-existing cause of action. At one point, courts had limited inverse condemnation only to circumstances where a private party would be liable to the property owner for the injury. (*Bunch*, at p. 439; *Belair*, at p. 562; *Albers v. Los Angeles County* (1965) 62 Cal.2d 250, 256 (*Albers*).) We subsequently clarified that ultimately, the just compensation clause is the "distinct constitutional source" that underlies a public entity's responsibility to compensate owners for those damages to private property resulting from the construction of a public improvement. (*Holtz v. Superior Court* (1970) 3 Cal.3d 296, 302 (*Holtz*).) Common law doctrines may offer a useful analogy, but the roots of inverse condemnation liability lie in constitutional terrain rather than the common law.

Given the constitutional roots and broad purposes associated with inverse condemnation claims, it is no surprise these can arise in a wide variety of contexts. A "deliberate action" undertaken by a public entity "in furtherance of public purposes" — including, of course, a public improvement such as

a water system or a flood control levee — can conceivably trigger an inverse condemnation action. (*Clement v. State Reclamation Board* (1950) 35 Cal.2d 628, 641 (*Clement*).) From underground excavation projects, to street construction, to the distinctive realm of flood control improvements, our inverse condemnation law covers the proverbial waterfront of public improvements. (See *Bunch, supra*, 15 Cal.4th 432; *Belair, supra*, 47 Cal.3d 550; *Holtz, supra*, 3 Cal.3d 296; *Bacich v. Board of Control* (1943) 23 Cal.2d 343 (*Bacich*).) Consistent across our assessment of these varied public works is the expectation that if an improvement is "inherently dangerous to private property," the public entity — by virtue of the constitutional provision — undertakes the responsibility "to compensate property owners for injury to their property arising from the inherent dangers of the public improvement or originating 'from the wrongful plan or character of the work.' " (*House v. L. A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 396 (*House*).)

What makes it a challenge to set the precise limits of a public entity's responsibility in practice is that multiple concerns, some arguably in tension with each other, are at stake in the interpretation of article I, section 19. One is to pool the burden to the individual property owner and distribute throughout the community the losses resulting from the public improvement. (*Bunch, supra*, 15 Cal.4th at p. 440; *Holtz, supra*, 3 Cal.3d at p. 303; *Albers, supra*, 62 Cal.2d at p. 263.) Another is to mitigate concerns that "compensation allowed too liberally will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost." (*Bacich, supra*, 23 Cal.2d at p. 350; see also *Holtz, supra*, at pp. 303-304; *Albers, supra*, 62 Cal.2d at p. 263.) Indeed, the parties' positions in this very case aptly illustrate how these concerns diverge.

WGS argues the City should be held liable in inverse condemnation, which would result in the cost of WGS's losses being spread across the entire community. The City and the Authority assert that the damages were caused by WGS's failure to install and maintain the required backwater valve. They maintain that if courts find public entities liable for damages resulting from private property owners' unlawful acts or failures to act, such entities will be discouraged from providing essential public works projects.

In advancing these competing positions, the parties focus on different aspects of the inverse condemnation analysis, each emphasizing a distinct concept drawn from our case law. We have previously held that "any actual physical injury to real property proximately caused by [a public] improvement as deliberately designed and constructed is compensable under [the California Constitution] whether foreseeable or not." (*Albers*, *supra*, 62 Cal.2d at pp. 263-264.)[2] We later recognized the potential confusion presented in *Albers* by our use of the term "proximate cause" — which in tort law is often defined largely in terms of foreseeability — in a case where the damage was not foreseeable, yet we still imposed inverse condemnation

---

[2] The two exceptions to the "strict liability rule" recognized in *Albers* were circumstances where the urgency or importance of the government conduct was so overriding that public policy advised against holding the government liable in inverse condemnation absent fault. (*Holtz*, *supra*, 3 Cal.3d at pp. 304-305; *Bunch*, *supra*, 15 Cal.4th at pp. 440-441.) The first addressed damages inflicted in the proper exercise of the government's police power; the second "occurred in the 'unique' context of water law." (*Bunch*, at p. 441, citing *Archer v. City of Los Angeles* (1941) 19 Cal.2d 19, 24-25.)

liability. (*Holtz, supra,* 3 Cal.3d 296, 304, fn. 9.) To mitigate confusion, we restated this test to eschew the term "proximate." What we used instead was the term " ' "substantial" causation.' " (*Belair, supra,* 47 Cal.3d at p. 559, quoting *Holtz, supra,* 3 Cal.3d at p. 304, fn. 9.)

Applying this concept of "substantial causation," we have explained in our inverse condemnation decisions that private landowners may establish inverse condemnation liability even where the public improvement as deliberately designed, constructed, and maintained was only one of several concurrent causes — provided the causal nexus between the risks inherent in the public improvement and the harm in question was sufficiently robust to create a pronounced likelihood of damage. (*Customer Co., supra,* 10 Cal.4th at p. 382 [" '[t]he destruction or damaging of property is sufficiently connected with "public use" as required by the Constitution, if the injury is a result of dangers *inherent in the construction of the public improvement* as distinguished from dangers *arising from the negligent operation of the improvement'* " (quoting *House, supra,* 25 Cal.2d at p. 396 (conc. opn. of Traynor, J.))]; *Youngblood v. Los Angeles County Flood Control Dist.* (1961) 56 Cal.2d 603, 610 (*Youngblood*) [requiring a showing that the improvement "as planned and installed by defendant, would necessarily or probably" cause the property damage].) What these decisions reflect is our concern not only with the deliberate design, construction, or maintenance of a public improvement, but also the nature of the causal relationship between the public work and the damages to private property.

The City and the Authority argue that the Court of Appeal simply assumed that a blockage in the sewer main caused WGS's property damage without addressing whether the

damages were caused by the inherent risks posed by the design, construction, or maintenance of the sewer system or by WGS's failure to install and maintain the legally required backwater valve. And they assert that the sewer system design required WGS, like all users of the sewer system, to comply with the Uniform Plumbing Code and local ordinances and its failure to do so prevented the system from functioning as deliberately designed. Because the Court of Appeal did not address whether the extent of the causal contribution of inherent risks associated with the sewer system's design (or, for that matter, its construction or maintenance) is sufficiently "substantial" to warrant inverse condemnation liability, the City posits that finding it liable under the circumstances would effectively saddle it with "strict liability," irrespective of the nature of inherent risks posed by the sewer system as deliberately designed, constructed, and maintained. Whether or not one understands WGS's argument as essentially a call for imposition of strict liability, the heart of this dispute indeed concerns the analysis a reviewing court must undertake to resolve an inverse condemnation claim.

In contrast, WGS contends the City is liable for the resulting damages from the sewer backup. According to WGS, a public improvement need only be a concurrent cause of damage in order for inverse condemnation liability to attach — so it is irrelevant to the inverse condemnation analysis whether WGS failed to install the required backwater valve. Although the trial court found that WGS's failure to install and maintain that valve was "a significant *secondary* cause" of the damage (emphasis added), what matters most for WGS is that the trial court found blockage in the sewer main to be a concurrent cause of the damage.

**B.**

Our conclusion follows from what we explained in *Customer Co.* and *Holtz*: a court assessing inverse condemnation liability must find more than just a causal connection between the public improvement and the damage to private property. What we hold is that the damage to private property must be substantially caused by an inherent risk presented by the deliberate design, construction, or maintenance of the public improvement. This approach aligns with how we have previously analyzed inverse condemnation liability cases. It also protects private property owners by allocating the financial losses resulting from the public improvement across the community and provides public entities with an incentive to internalize the reasonable risks of their public improvements.

The concepts of "inherent risk" and "substantial causation" address somewhat overlapping considerations but play distinct roles in the analysis of inverse condemnation. And both must be present for a public entity to be liable. We have explained that a public entity's construction of a public improvement is a deliberate action made "in furtherance of public purposes." (*Clement*, *supra*, 35 Cal.2d at p. 641.) If damage to private property is substantially caused by the inherent risks of the design or construction of a public improvement, a public entity must provide just compensation for the damage, whether it was intentional or the result of negligence by the public entity. (*Ibid.*; *Bauer v. Ventura County* (1955) 45 Cal.2d 276, 284.)

The inherent risk assessment requires a reviewing court to consider whether the inherent dangers of the public

improvement as deliberately designed, constructed, or maintained materialized and were the cause of the property damage. (*Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 607 (*Pacific Bell*), citing *House*, *supra*, 25 Cal.2d at p. 396.) This inquiry operates as a preventive measure to ensure that not all private property damage bearing some causal relationship to a public improvement results in liability. Rather, the injury to property must arise from the inherent dangers of the public improvement as deliberately designed, constructed, or maintained. (*House*, 25 Cal.2d at p. 396.) The inherent risk assessment — in line with the policy considerations underlying article I, section 19 — avoids open-ended liability by protecting public entities from liability for private property damage that is arguably connected to a public improvement but is not the result of the improvement's inherent risks. (*Belair*, *supra*, 47 Cal.3d at p. 558.)

Such risks may arise, for example, from a public entity's adoption of a comparatively lower cost plan to create the public improvement. Faced with a panoply of other legitimate needs ranging from critter control to health care, a public entity might decide against expending additional funds or employing more protective measures in the construction of a project, even though the construction plan as adopted poses certain risks of damage to private property and the additional expenditures or protections could likely prevent that risk of damage. (See *Holtz*, *supra*, 3 Cal.3d at p. 310.) The public entity may reach its decision because the likelihood of damage is remote, but the expense of additional protection is great. (*Ibid.*) Where the undertaking of the project at the lower cost creates "some risk, however slight, of damage to plaintiffs' property, it is proper to require the public entity to bear the loss when damage does

occur." (*Id.* at pp. 310-311.) In those circumstances, private property owners should be compensated for the damage to their property resulting from the inherent risks posed by the public improvement as reasonably undertaken at the lower cost because the public entity " 'is in a better position to evaluate the nature and extent of the risks of public improvement than are potentially affected property owners.' " (*Id.* at p. 311, quoting Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 495 (Van Alstyne).)

Although evidence could conceivably arise to the contrary that might trigger further scrutiny, we presume the public entity acted reasonably in reaching its decision to adopt a particular plan of design, construction, or maintenance. (See *Pacific Bell*, *supra*, 81 Cal.App.4th at p. 608 [reasoning the city's decision to install a system without monitoring capability may have been reasonable because the costs of monitoring may have outweighed the benefits].) This presumption acknowledges that we expect public agencies — as the public "locus of responsibility" for balancing efficiencies and costs — to proceed sensibly in the decision making process and avoid patently unreasonable assumptions in the planning of public improvements. (See *Holtz*, 3 Cal.3d at p. 311.) Yet it is consistent with protection of property owners, too: where damages are the direct consequence of the inherent risks posed by the public improvement, responsibility for the individual property owner's loss is spread across the community benefiting from the public work. (See *Bunch*, *supra*, 15 Cal.4th at p. 440.)

But useful public improvements must eventually be maintained and not merely designed and built. So the "inherent risk" aspect of the inverse condemnation inquiry is not limited to deliberate design or construction of the public improvement.

It also encompasses risks from the maintenance or continued upkeep of the public work. (See *Bauer, supra*, 45 Cal.2d at p. 285.) A public entity might construct a public improvement and then entirely neglect any kind of preventive monitoring or maintenance for the improvement. (See *Pacific Bell, supra*, 81 Cal.App.4th at pp. 599-600.) If the public entity makes a policy choice to benefit from the cost savings from declining to pursue a reasonable maintenance program, for instance, inverse condemnation principles command "the corollary obligation to pay for the damages caused when the risks attending these cost-saving measures materialize." (*Id.* at p. 608.) It may be sensible in some sense for a public entity to forgo regular monitoring and repair and instead adopt a "wait until it breaks" plan of maintenance to save on the costs of imposing a monitoring system. But the damages that result from the inherent risks posed by the public entity's maintenance plan should be spread to the community that benefits from lower costs, instead of leaving property owners adversely affected by the public entity's choice to shoulder the burden alone. (*Ibid.*)

A link to one of the aforementioned "inherent risks" is necessary, but not sufficient, for a successful inverse condemnation claim. The plaintiff must also establish substantial causation. Together, our inverse condemnation decisions offer a relatively clear picture of the causal relationship that must be shown for a claim to succeed. Liability depends on whether some element of physical, but-for causation is present to link the public improvement and the damage. The damage must be the " '*necessary* or *probable* result' of the improvement, or if 'the *immediate, direct, and necessary effect*' thereof was to produce the damage." (Van Alstyne, *supra*, 20 Hastings L.J at p. 436, fn. omitted, italics added.) Rather than

17

training attention on the mere presence of causation, our cases have focused instead on whether there is proof that the damages "followed in the normal course of subsequent events" and were "predominantly" produced by the improvement. (*Ibid.*, citing *Youngblood, supra*, 56 Cal.2d 603; *Los Angeles C. Assn. v. Los Angeles* (1894) 103 Cal. 461, 470.)

At the core of the test is the requirement that — even in the case of multiple concurrent causes — the injury to private property is an "inescapable or unavoidable consequence" of the public improvement as planned and constructed. (Van Alstyne, at p. 437, fn. 32.) As in the somewhat analogous tort law context, this test permits courts to consider a plaintiff's act or omission in the chain of causation, for example, a property owner's own failure to follow reasonable requirements imposed by the public entity to reduce the risk to the public improvement. (See Rest.2d Torts, § 442; see also Van Alstyne, at p. 437.) Accordingly, the substantial causation element of the analysis ensures liability is imposed only in instances where there is a sufficiently meaningful causal relationship between the damage to private property and the inherent risks posed by the public improvement as designed, constructed, or maintained. This approach avoids treating inverse condemnation as a species of strict or " 'absolute liability' " that would avoid the necessary analysis of inherent risks and substantial causation, frustrating the development of public improvements because of the increased costs to public entities. (*Holtz, supra*, 3 Cal.3d at p. 304.)

To prevail on its claim of inverse condemnation liability, then, WGS must succeed under the correct legal analysis. It must demonstrate that the inherent risks posed by the sewer system as deliberately designed, constructed, or maintained

manifested and were a substantial cause of its property damage. WGS contends that an inherent risk of a sewer system is blockage caused by roots or foreign objects in the sewer main. Citing our opinion in *Belair*, WGS posits that the sewer system failed to function as intended because of the blockage, and the City should be held liable as the public improvement is connected in some manner to the damage to private property. Inverse condemnation liability, under WGS's theory, attaches irrespective of whether the property damage could have been mitigated or extinguished if the affected property owner had installed the legally-required backwater valve.

Yet WGS misinterprets our precedent. *Belair* addressed the unique problems of flood control litigation — arising in a distinctive context that bears only a limited relationship to our analysis of public improvements in other contexts — through an inverse condemnation claim related to levees that failed to protect an area historically subject to flooding. (*Belair, supra*, 47 Cal.3d at pp. 555-557, 560.) We concluded that despite heavy rainstorms contributing to the flooding, the levee was still a substantial concurring cause of the damages because "the improvement failed to function as it was intended." (*Id.* at p. 560.) This "failed to function as intended" concept was relevant in *Belair* only to eliminate natural flooding as a cause of the damage. (*Id.* at pp. 561-562.) Contrary to WGS's contention, *Belair* did not announce a rule triggering liability in all inverse condemnation cases based solely on the existence of any conceivable causal connection between a public improvement and private property damage. WGS also relies on *City of Palo Alto*, which applied *Belair*'s "failed to function as intended" phrase in a sewage backup case. (*City of Palo Alto, supra*, 138 Cal.App.4th at pp. 476-477, 483.) Citing *Belair*, the *City of Palo*

*Alto* court concluded that the purpose of the sewer was to carry wastewater *away* from the residence. The sewer failed to carry the wastewater away because of a blockage in the sewer main, so it "failed to function as intended" and the city should be liable in inverse condemnation. (*Id.* at p. 483.) WGS adopts this argument, asserting that the City's sewer "failed to function as intended" because it did not carry the sewage away from the private property.

If we adopted the reasoning from *City of Palo Alto*, as WGS urges, we would overlook a crucial aspect of the inverse condemnation inquiry. Indeed, under WGS's analysis, liability for the public entity would attach whenever a public improvement is a concurrent cause of damage to private property, regardless of whether private property owners acted to defeat the deliberate design or construction of the improvement. The principles underlying article I, section 19 cut against this conclusion. (*Bacich*, *supra*, 23 Cal.2d at p. 350 [citing concerns that "compensation allowed too liberally will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost"].) Instead, a court reviewing an inverse condemnation claim arising from sewage overflow must consider whether the damages to private property were the direct and necessary effect of the inherent risks posed by the public improvement as deliberately designed, constructed, or maintained. And in a case like this, a reviewing court must also assess whether the damages were the result of a risk created not by the public improvement, but by the acts of the private property owner. A causal connection between the public improvement and the property damage alone is

insufficient to sustain a finding of inverse condemnation liability.[3]

## III.

The Court of Appeal cited cases clarifying that inverse condemnation liability arises where a public improvement, as designed and constructed, presents an inherent risk of damage that materializes and causes damage to private property. It did not analyze whether the City's decision to implement a gravity flow sewer system that relied in part on property owners installing and maintaining backwater valves as required by law constituted an inherent risk arising from the design, construction, or maintenance of the public improvement, and if so, whether WGS's damage was substantially caused by that inherent risk. What the Court of Appeal concluded instead is this: to prevail, the City must prove that other forces, with no connection to the design, construction, or maintenance of the sewer, alone produced the injury. The Court of Appeal also rejected the City's argument that WGS's failure to install and maintain the legally required backwater valve was a sufficiently significant intervening cause that superseded the improvement in the chain of causation. By failing to analyze inverse condemnation with sufficient focus on substantial causation by inherent risks associated with the public improvement, and presuming that the City must disprove any causal connection to the harm, the Court of Appeal erred.

---

[3] To the extent it conflicts with this holding, we disapprove *California State Automobile Assn. v. City of Palo Alto*, *supra*, 138 Cal.App.4th 474. To the extent it adopts the "failed to function as intended" concept from *Belair* into the sewage overflow context, we also disapprove.

At no point in these proceedings has WGS shown the damage to its property was substantially caused by an inherent risk of the City's sewer system, as deliberately designed, constructed, or maintained — nor has it given us any rationale to doubt that the City made reasonable assumptions in reaching its decision for the design, construction, or maintenance of the sewer system. In fact, the record supports that the City acted reasonably in adopting the design for the sewer system, and that the sewer was designed in accordance with the accepted practices for designing and constructing sewer systems of that time. The trial court had before it evidence that at the time of the sewage backup, there was no backwater valve installed on WGS's private sewer lateral and if a fully functional backwater valve or backflow prevention device had been installed on WGS's sewer lateral, as required by law, the sewage backup incident could have been averted. Consider what it means to ignore the missing backwater valve in this case. We'd be airbrushing out of the picture not only the City's considered judgment about what it would take to balance safety and practical considerations for this public improvement, but WGS's noncompliance with an ordinary planning code requirement that would have eliminated or at least mitigated risks of sewage backup damage. That is hardly different from turning inverse condemnation into a basis for automatic imposition of liability on the public entity if even a tenuous causal connection exists between the public improvement and private property damage, irrespective of whether a plaintiff's act or omission materially contributes to the risk. And it ignores that the City, like all public entities in an imperfect world of scarce resources, is in the business of weighing safety, the availability of resources, and possible risks that may result from its public improvements.

So we cannot conclude that the invasion of raw sewage into WGS's private property was an inherent risk of the sewer system as deliberately designed and constructed. Nor can we conclude that the backup of sewage into WGS's offices was the necessary or probable result of the sewer system's operations. And the City did not act unreasonably in expecting private property owners to comply with the law. This finding is consistent with the policy considerations underlying article I, section 19, because WGS, if uncompensated, will not contribute more than its proper share to the public undertaking. The damage to its property could have been averted had WGS installed the backwater valve, and so the loss suffered by WGS should not be distributed throughout the community. We find the City is not liable in inverse condemnation for the damage to WGS's private property.

## IV.

When public improvements damage private property, property owners not compensated earlier may seek recovery through inverse condemnation claims. But to succeed, such claims must demonstrate more than just a causal link — however tenuous — between the existence of the public improvement and the property damage. Instead, inverse condemnation liability depends on whether the property damage was the probable result or necessary effect of an inherent risk associated with the design, construction, or maintenance of the relevant public improvement.

The damage to WGS's property arguably bears some connection to the design, operation, and maintenance of the sewer system: the sewage passed through the system before emerging in the dentist's office, and it was perhaps possible in

principle to design a sewage system that made backwater valves entirely redundant. Yet we cannot say the damage was substantially caused by that system when WGS failed to fulfill a responsibility to install a backwater valve, and that reasonable requirement would have prevented or substantially diminished the risk of the mishap that spawned this case. The backup of sewage into WGS's offices was not the necessary result or unavoidable consequence of any risk posed by the sewer system. And the City acted reasonably in adopting the sewer design and presuming private property owners would comply with the law by installing and maintaining backwater valve devices to prevent sewage backups into private property. The City is not liable in inverse condemnation. We reverse the judgment of the Court of Appeal and vacate its order denying the petition for writ of mandate and direct the Court of Appeal to remand this case to the superior court for further proceedings consistent with this opinion.

**CUÉLLAR, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** City of Oroville v. Superior Court
_____

**Unpublished Opinion** XXX NP opn. filed 6/13/17 – 3d Dist.
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S243247
**Date Filed:** August 15, 2019
_____

**Court:** Superior
**County:** Butte
**Judge:** Sandra L. McClean

_____

**Counsel:**

Peters, Habib, McKenna & Juhl-Rhodes, Mark A. Habib, Lia M. Juhl-Rhodes; Colantuono, Highsmith & Whatley, Michael G. Colantuono, Jennifer L. Pancake; Cota Cole & Huber, Cole Huber and Scott E. Huber for Petitioner.

Michael N. Feuer, City Attorney (Los Angeles), Blithe Smith Bock and Timothy McWilliams, Assistant City Attorneys, for League of California Cities, California Joint Powers Insurance Authority, Public Entity Risk Management Authority, California Special Districts Association, California Association of Joint Powers Authorities and California Sanitation Risk Management Authority as Amici Curiae on behalf of Petitioner.

No appearance for Respondent Superior Court.

Gibbons & Conley, A. Byrne Conley and Peter A. Urhausen for Real Party Interest California Joint Powers Risk Management Authority.

Berding Weil, Jordan M. Rojas and James O. Devereaux for Real Parties in Interest Timothy G. Wall, Sims W. Lowry and William A. Gilbert.

Meyers, Nave, Riback Silver & Wilson, John Bakker and Kenton L. Alm for California Association of Sanitation Agencies as Amicus Curiae on behalf of Petitioner and Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael G. Colantuono
Colantuono, Highsmith & Whatley
420 Sierra College Drive, Suite 140
Grass Valley, CA  95945
(530) 432-7357

Peter A. Urhausen
Gibbons & Conley
Hookston Square
3480 Buskirk Avenue, Suite 200
Pleasant Hill, CA  94523
(925) 932-3600

James O. Devereaux
Berding Weil
2175 North California Boulevard, Suite 500
Walnut Creek, CA  94596
(925) 838-2090