Filed 5/23/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SIMPLE AVO PARADISE RANCH, LLC, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> SOUTHERN CALIFORNIA EDISON COMPANY, <br><br> Defendant and Appellant. | B320948 <br><br> (Los Angeles County Super. Ct. No. 19STCV09910; JCCP No. 4965) |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Daniel J. Buckley, Judge. Affirmed.

Glynn, Finley, Morti, Hanlon & Friedenerg, Clement L. Glynn, James M. Hanlon, Jr. and Adam M. Rapp for Plaintiff and Respondent.

Berger Kahn, Craig S. Simon and Adam M. Romney; Grotefeld Hoffman, Mark Grotefeld, Jordan B. Everakes and David J. Kestenbaum for National Association of Subrogation Professionals as Amicus Curiae on behalf of Plaintiff and Respondent.

Singleton Schreiber, Benjamin I. Siminou and Harini P. Raghupathi for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Respondent.

Hueston Hennigan, John C. Hueston, Douglas J. Dixon, Padraic W. Foran; Southern California Edison Company, Belynda S. Reck, Patricia A. Cirucci and Brian Cardoza for Defendant and Appellant.

Vinson & Elkins, Mortimer H. Hartwell, Jeremy C. Marwell and Nathan Campbell for Edison Electric Institute as Amicus Curiae on behalf of Defendant and Appellant.

Haight Brown & Bonesteel, Arezoo Jamshidi, Kaitlyn A. Jensen, Krsto Mijanovic, Patrick F. McIntyre and Steven Scordalakis for Liberty Utilities (Calpeco Electric) LLC as Amicus Curiae on behalf of Defendant and Appellant.

Skadden, Arps, Slate, Meagher & Flom, Peter B. Morrison and Zachary Faigen; Shay Dvoretzky for Nextera Energy Resources, LLC as Amicus Curiae on behalf of Defendant and Appellant.

Munger, Tolles & Olson, Henry Weissmann, Jonathan E. Altman and Anne K. Conley for Pacific Gas & Electric Company, San Diego Gas & Electric Company and PacifiCorp as Amicus Curiae on behalf of Defendant and Appellant.

————————————————

# INTRODUCTION

This case arises from the 2017 Thomas Fire in Southern California and is one of the hundreds of lawsuits coordinated in proceedings involving three plaintiff groups.[1] Defendant and appellant Southern California Edison Company (SCE) appeals from a stipulated judgment entered in favor of plaintiff and respondent Simple Avo Paradise Ranch, LLC (Simple Avo), a member of the individual plaintiff group.

Before Simple Avo filed the present lawsuit, as further explained below, the trial court had previously overruled SCE's demurrer to the cause of action for inverse condemnation in the master complaints filed by each of the plaintiff groups. Simple Avo did not itself file any of the master complaints in this action, nor did it participate in the briefing or argument on SCE's demurrer before the trial court. Rather, Simple Avo checked a box on a form complaint indicating the causes of action it asserted and acceded to the trial court's demurrer ruling. Simple Avo and SCE subsequently settled for an undisclosed amount and entered into a stipulated judgment whereby SCE would pay $1.75 million to Simple Avo on the inverse condemnation claim, subject to SCE's appeal of the demurrer ruling. Simple Avo dismissed all its other causes of action with prejudice.

This case presents two issues. The first is whether the stipulated judgment is appealable and whether this case presents a justiciable controversy. Stipulated judgments are not generally appealable, but the California Supreme Court has acknowledged

---

[1] The three groups in the coordinated proceedings are the individual plaintiffs, the public entity plaintiffs, and the subrogation plaintiffs.

an exception when "'consent was merely given to facilitate an appeal." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 400 (*Norgart*), quoting *Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 817 (*Building Industry*).) Over the past several decades, the courts have expanded the exception and allowed parties to obtain immediate appellate review of summary judgments, motions in limine, and just about everything in between. Under *Norgart*, the only requirement to invoke this exception is that the parties intend to seek appellate review. But this by itself is an insufficient constraint. Indeed, following the reasoning of *Norgart*, we are compelled to give effect to the parties' intent in this case to obtain immediate appellate review of an overruled demurrer (which is not generally appealable) in a coordinated proceeding (which impacts hundreds of other parties). The exception allowing appeals from stipulated judgments warrants reconsideration or refinement from our high court. Otherwise, the exception will continue to expand and swallow the rule.

The second issue is whether the trial court erred in overruling SCE's demurrer to the inverse condemnation cause of action. We conclude the stipulated judgment is appealable and justiciable, and that the trial court correctly overruled the demurrer. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Background: The Consolidated Actions Arising from the Thomas Fire*

The 2017 Thomas Fire in Ventura and Santa Barbara counties, as described by state authorities, was the largest fire in California's modern history and the seventh most destructive.

4

Hundreds of lawsuits were filed against SCE and Edison International, alleging tort and inverse condemnation causes of action based on plaintiffs' claims the fire was caused by downed power lines. The cases were coordinated in a Judicial Council coordination proceeding and three groups of plaintiffs were formed: individual plaintiffs, public entity plaintiffs, and subrogation plaintiffs. On July 12, 2018 lead counsel for each of the plaintiff groups filed three master complaints. For purposes of this opinion, we are only concerned with and rely only on the allegations in the individual plaintiffs' master complaint.

As relevant here, the master complaint alleged SCE is a "public utility" that is granted an exclusive franchise by the State of California to operate a monopoly or quasi-monopoly for the distribution of electricity to the residents and businesses of Central, Coastal, and Southern California.[2] The master complaint alleged Edison International was SCE's parent company and a public utility. The Thomas Fire was purportedly sparked on December 4, 2017 by unsafe electrical infrastructure owned, operated, and maintained by SCE. Although SCE was able to temporarily de-energize its line in high fire-threat areas, it chose not to do so that day.

The master complaint further alleged SCE's infrastructure had caused previous fires and that the California Public Utilities Commission (CPUC) had levied millions of dollars in fines against SCE for its failure to mitigate the risks associated with its "ineffective vegetation management programs, unsafe

---

[2]    "'Public utility' includes every . . . electrical corporation, . . . where the service is performed for, or the commodity is delivered to, the public or any portion thereof." (Pub. Util. Code, § 216, subd. (a)(1).)

equipment, and/or aging infrastructure." Specifically, 63.3 percent of SCE's electrical distribution system was comprised of overhead lines, with most of its poles installed just after World War II. SCE has not brought the older poles into compliance with modern safety standards. In 2014 SCE allegedly proposed a program to inspect, assess, and remediate poles that did not meet current standards. In 2018 SCE acknowledged it had failed to meet its own program targets for assessment or remediation of its poles. It extended its program from seven years to 10 years. It also modified its software program, reducing the number of poles in need of remediation.

On August 3, 2018 SCE and Edison International demurred to the cause of action for inverse condemnation in each of the master complaints. An action for inverse condemnation is "an action to recover damages for injuries to private property caused by a public improvement." (*City of Oroville v. Superior Court* (2019) 7 Cal.5th 1091, 1097 (*Oroville*).) To state a claim for inverse condemnation, a plaintiff must allege "[1.] a public entity [2.] has taken or damaged their property [3.] for a public use." (*Barham v. Southern Cal. Edison Co.* (1999) 74 Cal.App.4th 744, 751 (*Barham*).)

SCE and Edison International's principal argument on demurrer was that neither defendant was a public entity able to spread its losses as a matter of right, as, for example, a municipality could by raising taxes. Instead, they were privately-owned corporations that needed approval from the CPUC to raise their rates. They cited a 2017 CPUC decision rejecting the request of a different utility—San Diego Gas & Electric (SDG&E)—to raise its rates to cover the cost of a different fire. According to SCE and Edison International, the CPUC's decision in that case demonstrated privately-owned utility companies such as SCE lacked authority to spread the losses from the

Thomas Fire. Under these circumstances, SCE and Edison International argued they were not public entities subject to liability for inverse condemnation. SCE also demurred on the ground the master complaint failed to allege the remaining elements of an inverse condemnation cause of action.

The plaintiff groups each filed an opposition to the demurrer. All three plaintiff groups relied on two cases— *Barham, supra,* 74 Cal.App.4th at page 751, and *Pacific Bell Telephone Co. v. Southern California Edison Co.* (2012) 208 Cal.App.4th 1400 (*Pacific Bell*)—which addressed and rejected the precise issues raised by SCE in its demurrer. Indeed, SCE was the defendant in both *Barham* and *Pacific Bell.* The individual plaintiffs additionally requested judicial notice of rulings by trial courts and orders by the Courts of Appeal following writ petitions that adopted the holdings in *Barham* and *Pacific Bell.* The trial court granted the request for judicial notice. The defendants filed one reply brief in response to the three oppositions, arguing *Barham* and *Pacific Bell* were wrongly decided.

On October 4, 2018 the trial court overruled the demurrer on the ground that it was bound by *Barham* and *Pacific Bell,* which held that, even as a privately-owned utility, SCE could be liable for inverse condemnation. The trial court observed that the CPUC's 2017 decision regarding SDG&E did not predict any future decision the CPUC might make regarding the Thomas Fire and SCE and Edison International. It reasoned that the CPUC's "fact specific" analysis utilized in determining whether to authorize a rate increase meant that whether SCE could obtain such an increase in the future presented a factual dispute not appropriate for demurrer. Relying on *Pacific Bell,* the trial court concluded that a utility's ability to raise rates unilaterally did not

7

by itself determine potential liability for inverse condemnation. The trial court additionally determined plaintiffs had sufficiently alleged the damage and public use elements of an inverse condemnation cause of action.

SCE and Edison International filed a petition for writ of mandate seeking review of the trial court's demurrer ruling, which this court denied in December 2018.

B.    *Simple Avo's Lawsuit*

Simple Avo is an avocado farm owned by a private equity firm and other investors. On March 25, 2019, five months after the trial court overruled SCE and Edison International's demurrer, Simple Avo filed its complaint. It was a short form complaint that adopted and incorporated the individual plaintiffs' master complaint. Simple Avo checked boxes indicating, among other things, the defendants it was suing, its insurer, damages suffered, and its causes of action. Simple Avo "agree[d] to be bound by any rulings with respect to the pleadings," including the trial court's prior demurrer ruling. As such, SCE and Edison International did not file a demurrer to Simple Avo's complaint, nor did Simple Avo ever defend against a demurrer. The record before us does not indicate any motion practice between the parties to this appeal. Simple Avo's case was added to the Judicial Council coordination proceedings on May 7, 2019.

In January 2022 Simple Avo settled with SCE and Edison International. The parties stipulated to: (1) dismiss with prejudice all of Simple Avo's claims against Edison International; (2) dismiss with prejudice all of Simple Avo's causes of action against SCE, except for inverse condemnation; and (3) enter judgment in favor of Simple Avo on the inverse condemnation claim in the amount of $1.75 million. The stipulation further

8

stated: "This stipulated final judgment resolving all of the claims in this case is without prejudice to the rights of SCE to appeal this final judgment, including the Court's October 4, 2018, order denying SCE's August 3, 2018, Demurrer," and "Plaintiff [Simple Avo] hereby waives, pursuant to Code of Civil Procedure § 995.230, any requirement that SCE post an undertaking, bond or security deposit to stay, and agrees not to enforce the Judgment pending appeal from this Judgment." The trial court entered the stipulated judgment and SCE timely appealed.

## DISCUSSION

This case presents an unusual set of circumstances. We first address the appealability of the parties' stipulated judgment and conclude that, while we have serious reservations about its appealability, we are required to give effect to the parties' intent to obtain appellate review of the trial court's demurrer ruling. This appeal—involving what one amicus curiae characterizes as a "cherry-pick[ed]" respondent—is at the outer limits of what constitutes a justiciable case. As explained further below, the exception allowing appeals from stipulated judgments warrants revisiting from the California Supreme Court as the Courts of Appeal have been unable to craft reasonable limits on it given the expansive language with which the exception was articulated in *Norgart*.

As to the order on the demurrer, SCE questions the continued viability of *Barham* and *Pacific Bell*. It urges us to depart from their holdings in favor of a categorical rule that privately-owned utility companies, such as SCE, cannot be liable for inverse condemnation as a matter of law because they cannot unilaterally raise their rates. SCE additionally contends that

9

Simple Avo has not alleged other elements of the inverse condemnation cause of action. At bottom, the question before us is whether the master complaint sufficiently alleges inverse condemnation against SCE, and we conclude that it does.

A.    *Whether the Parties' Stipulated Judgment Is Appealable*

Whenever a doubt exists as to whether the trial court has entered an appealable judgment, an appellate court must consider appealability on its own even if the parties have not raised the issue because we ordinarily must dismiss an appeal from a judgment that is not appealable. (See *Jennings v. Marralle* (1994) 8 Cal.4th 121, 126; *Baker v. Castaldi* (2015) 235 Cal.App.4th 218, 222 [court requested supplemental briefing on appealability where "[n]either party raised this issue in their initial briefs"].)

1.    *SCE's and amici curiae's briefs on appealability*

SCE's opening brief asserted the stipulated judgment was a final judgment made appealable by Code of Civil Procedure section 904.1, subdivision (a)(1). It acknowledged the general rule that stipulated judgments are not appealable, but argued the stipulated judgment here fell under the "well-established" exception that a party may appeal from a stipulated judgment when "'consent was merely given to facilitate an appeal following adverse determination of a critical issue.'" (*Norgart, supra,* 21 Cal.4th at p. 400, quoting *Building Industry, supra,* 41 Cal.3d at p. 817.)

Simple Avo's respondent's brief did not address appealability. Instead, the National Association of Subrogation Professionals (NASP) and Consumer Attorneys of California (CAC) raised the issue in amicus curiae briefs, arguing the

10

stipulated judgment was not appealable.[3]  SCE initially responded only to NASP's amicus brief.  We asked Simple Avo and SCE to submit supplemental briefing addressing appealability, justiciability, and NASP's and CAC's arguments to the extent they had not already done so.  Simple Avo filed no supplemental brief.  Having already answered NASP's amicus brief, SCE responded only to CAC's arguments in its supplemental brief.  We granted CAC's and NASP's requests to appear at oral argument.

> 2.      *The appealability of stipulated judgments*

A stipulated judgment is not generally appealable.  (See *Norgart, supra,* 21 Cal.4th at p. 400; *Mecham v. McKay* (1869) 37 Cal. 154, 158-159 (*Mecham*).)  The California Supreme Court has recognized an exception to this rule when "consent was merely given to facilitate an appeal following adverse determination of a critical issue." (*Building Industry, supra,* 41 Cal.3d at p. 817; *Norgart,* at p. 400.)

The exception originated in *Mecham.  Mecham* allowed an appeal to proceed from a stipulated order denying a motion for new trial.  (*Mecham, supra,* 37 Cal. at p. 158.)  The high court explained that an order or judgment entered pursuant to a stipulation is generally not appealable based "on the theory that by consenting to the judgment or order the party expressly waives all objection to it, and cannot be allowed afterwards, on appeal, to question its propriety, because by consenting to it he has abandoned all opposition or exception to it." (*Id.* at pp. 158-159.)  It recognized an exception to this rule for cases where "consent was given only *pro forma* to facilitate an appeal, and

---

[3]      We granted requests by six amici to file briefs in this matter.  We only address the issues raised by NASP and CAC.

11

with the understanding on both sides that the party did not thereby intend to abandon his right to be heard on the appeal." (*Id.* at p. 159.)

The Court next examined the exception over 100 years later in *Building Industry*.[4]  It applied *Mecham* to the case before it but limited the exception to stipulated judgments following an "adverse determination of a critical issue":  "If consent was merely given to facilitate an appeal following adverse determination of a critical issue, the party will not lose his right to be heard on appeal." (*Building Industry, supra*, 41 Cal.3d at p. 817.)  The Court also noted that "it is 'wasteful of trial court time' to require the plaintiff to undergo a probably unsuccessful court trial merely to obtain an appealable judgment." (*Ibid.*) There, the trial court had granted partial summary judgment for the defendant city, ruling that despite the potential applicability of an Evidence Code section shifting the burden of proof, the plaintiff retained the burden of proof on its claim.  (*Id.* at p. 815.) The plaintiff stipulated to entry of judgment for the city, conceding it could not prevail if it had the burden of proof.  (*Id.* at p. 816.)

The Court applied the exception in *Connolly v. County of Orange* (1992) 1 Cal.4th 1105 (*Connolly*) to a class action.  The trial court had granted extraordinary writ relief only to the named plaintiff.  The parties subsequently stipulated the same

---

[4]     In the intervening years, as relevant here, the high court cited *Mecham* not for the exception it articulated, but for the general rule that stipulated judgments or orders are nonappealable.  (See, e.g., *Sleeper v. Kelly* (1863) 22 Cal. 456, fn. 1; *Erlanger v. Southern Pac. R. R. Co.* (1895) 109 Cal. 395, 396; *Hibernia Sav. & Loan Soc. v. Waymire* (1907) 152 Cal. 286, 287-288.)

relief would be granted to the 200 class members, and the trial court entered a stipulated judgment in favor of the class. Without substantive analysis, *Connolly* ruled the exception applied to make the stipulated judgment as to the class appealable. (*Id.* at p. 1111.)

The Court gave its most complete explanation of the exception in *Norgart*.[5] It reiterated the twin rationales for the exception from *Building Industry*. (See *Norgart*, *supra*, 21 Cal.4th at p. 400.) But *Norgart* abandoned any requirement of an adverse determination of a critical issue in favor of a focus on the parties' intent: "any 'adverse determination' . . . is not a legal condition that defines the exception, but only a factual circumstance that may happen to accompany, and explain, the plaintiff's consent to an unfavorable judgment or order. For it is 'accidental' *why* the plaintiff might desire 'to facilitate an appeal.' [Citation.] It is 'essential,' however, that the plaintiff actually so desire."[6] (*Norgart,* at p. 402.) In other words, an "adverse determination" of "a critical issue" are not affirmative

---

[5] In *Norgart*, the plaintiffs sued for wrongful death. The defendant moved for summary judgment on statute of limitations grounds, relying on a then newly-decided appellate decision articulating a discovery rule. The parties agreed the plaintiffs' wrongful death claim would be time-barred under that new rule. To hasten appellate review, the plaintiffs stipulated to a judgment against them. (*Norgart, supra,* 21 Cal.4th at pp. 392-393.)

[6] Justice Kennard objected to the majority's decision to reach the merits because in her view "the parties may not by stipulation artificially convert a nonappealable interim ruling denying summary judgment into an appealable final judgment." (*Norgart, supra,* 21 Cal.4th at p. 412 [conc. & dis. opn. of Kennard, J.].)

13

requirements or limitations on the exception, but instead merely describe the circumstances under which a stipulated judgment may arise.

The Courts of Appeal expanded the exception from summary judgments to cases involving motions in limine, nonsuits, and judgment on the pleadings. (See, e.g., *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431 (*Tudor Ranches*) [motion in limine]; *Villano v. Waterman Convalescent Hospital, Inc.* (2010) 181 Cal.App.4th 1189 [in limine rulings tantamount to nonsuit]; *Tos v. State of California* (2021) 72 Cal.App.5th 184, 194 [judgment on the pleadings].) The only limitation the courts have imposed on the exception is a requirement that the stipulated judgment adjudicate all claims.[7]

Amicus CAC proposes a limitation on the exception requiring that a stipulated judgment must follow an adverse determination that is "outcome determinative" or "dispositive." In its view, the overruling of SCE's demurrer to the master complaint is not such a ruling because it does not "devastate"[8]

---

[7] See, e.g., *Harrington-Wisely v. State of California* (2007) 156 Cal.App.4th 1488, 1496 ("the exception may not be invoked when, as here, the stipulated judgment fails to dispose of all claims between the parties"); *Tudor Ranches, supra,* 65 Cal.App.4th at pp. 1429-1430 (stipulated judgment that does not dispose of all claims between parties is not appealable); *Four Point Entertainment, Inc. v. New World Entertainment, Ltd.* (1997) 60 Cal.App.4th 79, 81 (judgment before court was "'final' in name only" because, in substance, it did not dispose completely of all claims between parties).

[8] See, e.g., *Hensley v. San Diego Gas & Electric Co.* (2017) 7 Cal.App.5th 1337, 1341, fn. 3 (trial court excluded evidence of

14

SCE's case on the merits and is not dispositive[9] because SCE could still proceed to trial and prevail. Although some Court of

all emotional distress damages, which constituted most of the plaintiff's claimed damages); *Martinez v. Robledo* (2012) 210 Cal.App.4th 384, 387 (trial court limited measure of damages for wrongful injury of a pet to the market value of the pet, which was minimal); *McMahon v. Craig* (2009) 176 Cal.App.4th 1502, 1508 (the plaintiff "determined the trial court's rulings had severely impaired the value and viability of her case"); *Tudor Ranches, supra,* 65 Cal.App.4th at p. 1427 (in limine rulings prevented plaintiff from presenting its case); *City of South San Francisco v. Mayer* (1998) 67 Cal.App.4th 1350, 1353 (trial court decided motion in limine that limited the value of the defendants' property in condemnation action); *Kenworthy v. Hadden* (1978) 87 Cal.App.3d 696, 700 (trial court ruled against appellant on appellant's "major contention" and appellant elected not to go to trial on any other issues).

[9] See, e.g., *Tos v. State, supra,* 72 Cal.App.5th at p. 194, fn. 4 (stipulated judgment appealable because the constitutionality of a bond statute was dispositive of all of plaintiffs' claims); *State Farm General Ins. Co. v. Frake* (2011) 197 Cal.App.4th 568, 576 (stipulated judgment "was intended to facilitate State Farm's appeal of the dispositive coverage issue in this case"); *Monticello Ins. v. Essex Ins. Co.* (2008) 162 Cal.App.4th 1376, 1383-1384 (concluding "the parties properly stipulated to judgment in order to obtain immediate appellate review of the trial court's critical and outcome-determinative ruling"); *Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1437 (trial court found the plaintiffs lacked standing to assert claim for wrongful death); *Aloha Pacific, Inc. v. California Ins. Guarantee Assn.* (2000) 79 Cal.App.4th 297, 306, fn. 6 (trial court denied the plaintiff's motion for summary judgment finding on undisputed facts the defendant should prevail as a matter of law); *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27-28 (trial court's order excluded "bulk

15

Appeal decisions involve such circumstances or could be read as supporting such a rule, these characteristics are not affirmative limits on the exception but merely reflect the circumstances under which the cases were decided.  Indeed, *Norgart* forecloses such limitations.  As noted above, *Norgart* explained that "any 'adverse determination' . . . is not a legal condition that defines the exception, but only a factual circumstance that may happen to accompany, and explain, the plaintiff's consent to an unfavorable judgment or order," and it is the parties' intent that controls.  (*Norgart, supra,* 21 Cal.4th at p. 402.)

> 3.     *The mootness doctrine and the stipulated judgment*

We also asked the parties to address whether this case presents a justiciable controversy.  As noted above, the stipulated judgment included a payment of $1.75 million from SCE to Simple Avo contingent on the outcome of this appeal.

*Hensley v. San Diego Gas & Electric Co.* (2017) 7 Cal.App.5th 1337 dealt with a similar situation.  There, the parties agreed to a stipulated judgment where the plaintiffs received an undisclosed sum from the defendant in settlement of their claims but reserved the right to appeal the trial court's *in limine* ruling that plaintiffs could not introduce evidence of emotional distress damages.  The parties agreed the plaintiffs would receive an additional sum from the defendant if they were successful on appeal.  (*Id.* at p. 1342.)  *Hensley* concluded the case

---

of the evidence upon which" plaintiffs "base[d] their causes of action" and was "tantamount to a nonsuit"); *Holmes v. Roth* (1992) 11 Cal.App.4th 931, 934, fn. 1 ("sole disputed issue" was decided against appellant); *Dong v. Board of Trustees* (1987) 191 Cal.App.3d 1572, 1576 (trial court's exclusion of plaintiff's evidence exposed his case to nonsuit).

was not moot because the additional sum was a liquidation of the plaintiffs' emotional distress damages. (*Id*. at p. 1345.) But *Hensley* also stated, "We discourage parties from reaching agreements that arbitrarily stake payments or 'bet' on the outcome of an appeal so as to avoid rendering their case moot, or from creating an agreement divorced from the controversy for the exclusive purpose of obtaining a decision on a matter. Where an issue left to be decided is entirely unrelated to the controversy, parties risk a finding that their settlement has mooted any appeal." (*Id.* at p. 1346.)

We likewise conclude this case is not moot due to the potential $1.75 million payment to Simple Avo, which we deem a liquidation of its inverse condemnation damages. But we join *Hensley* in discouraging such "side bets" on the outcome of an appeal for purposes of obtaining an appellate decision.

4. *Under* Norgart*, the stipulated judgment is appealable, but we have serious reservations the exception should apply under the circumstances here*

Amici argue that "[a]llowing this appeal to go forward would mark . . . an unprecedented carve-out from the rule barring appeals from consent judgments" and is an "attempt by SCE to artificially manufacture appellate jurisdiction against a Respondent of its own choosing." Specifically, NASP contends that "while California may permit parties to stipulate to an immediate appeal in certain cases, those exceptions have never been applied in the context of complex coordinated actions before a JCCP Court" and that, at the time it filed its brief, "several

17

hundred Thomas Fire claims [were] still pending in the JCCP action."[10]

We question whether the exception should apply in a coordinated proceeding such as this one involving hundreds of remaining lawsuits and where the respondent on appeal did not participate in drafting the master complaint, did not participate in opposing the demurrer challenged on appeal, and did not otherwise actively litigate any matter before the trial court. Of the hundreds of individual plaintiffs who settled with SCE, amici argue that only one settlement (this one) resulted in a stipulated judgment that allows SCE to appeal the trial court's ruling on demurrer. The $1.75 million "side bet," although technically permissible for the reasons explained above, also gives us pause.

In addition, SCE seeks to appeal from the overruling of its demurrer even though (1) "an order overruling a demurrer is not directly appealable" (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 912), and (2) it is not a foregone conclusion that it would be wasteful of trial court or litigants' time to require SCE to proceed to trial because SCE could very well prevail, obviating the need for an appeal. (See *Building Industry, supra*, 41 Cal.3d at p. 817.) As the trial court noted, the 2017 CPUC decision could create a factual issue precluding inverse condemnation liability. SCE also has other defenses on

---

[10] NASP further avers that "after much delay, SCE and Simple Avo represent to this court that its intervention is suddenly necessary to resolve a critical issue: 1) that Simple Avo has never litigated previously; 2) that SCE has attempted to overturn for decades; 3) that Simple Avo has no obvious stake in for future cases; and 4) under the hidden terms of a settlement agreement which no court has reviewed."

18

which it could prevail at trial: (1) it did not substantially cause the alleged damage; (2) the damage from the Thomas Fire was not caused by an inherent risk presented by the deliberate design, construction, or maintenance of the public improvement; and (3) the destruction or damage to Simple Avo's property was not for a public use.[11]

Despite these considerations and the availability of potential meritorious defenses for SCE at trial, *Norgart* compels us to give effect to the parties' stated intent to obtain appellate review. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We do not discern a principled basis or precedent to create a rule carving out coordinated proceedings from the exception. *Connolly*'s application of the exception to a stipulated judgment involving a plaintiff class suggests it is not improper to apply the exception in coordinated proceedings (see *Connolly, supra,* 1 Cal.4th at p. 1111), and *Norgart*'s focus on the parties' intent would preclude such a rule.

In this light, *Norgart*'s singular focus on the parties' intent to seek immediate appellate review warrants reconsideration or refinement of the exception authorizing appeals from stipulated judgments from the California Supreme Court. As noted above, *Norgart* dispenses with the adverse determination of a critical issue portion of the exception and directs that only the parties' intent is "essential" to the inquiry. (*Norgart, supra,* 21 Cal.4th at

_____

[11] CAC and NASP raised additional factual disputes that would have to be resolved against SCE in order to find it liable for inverse condemnation. These relate to whether the creation of a Wildfire Fund or the entry of a consent order would entitle SCE to spread costs. We need not assess what impact these could have on liability or at trial, but note them to highlight the availability of defenses to SCE at a trial.

19

p. 402.)  The requirement that a stipulated judgment must follow from an adverse determination of a critical issue (see *Building Industry, supra*, 41 Cal.3d at p. 817) that is outcome determinative sets a reasonable boundary around the exception. But, even then, the meaning of "a critical issue" is relative and differs in any given individual case.  That is why the exception has expanded from summary judgment motions to motions in limine, and just about everything in between.

We agree with *Tudor Ranches* that, "without some limitation on the . . . exception, a party theoretically could obtain immediate appellate review of any . . . ruling . . . provided both parties were willing to stipulate to a judgment finally disposing of all claims. . . .  Without guidance from precedent, we conclude that, if the . . . exception is to be thus limited, the limitation should come from the Supreme Court."  (*Tudor Ranches, supra,* 65 Cal.App.4th at p. 1431.)  Under the current state of the law, all a party needs to overcome the rule against the appealability of stipulated judgments or orders is a well-crafted stipulation demonstrating the parties' intent to do so.  Without any meaningful limitation on the exception, it truly has swallowed the rule.

B.     *The Individual Plaintiffs' Master Complaint Adequately Alleged a Claim for Inverse Condemnation Against SCE*

SCE contends Simple Avo failed to state a cause of action for inverse condemnation.  SCE reiterates many of the arguments it raised in *Barham* and *Pacific Bell* that those courts rejected. In all events, we examine SCE's arguments in the context of the case before us but decline to depart from the well-reasoned and long-standing holdings of *Barham* and *Pacific Bell*.  Further, we

20

are not persuaded that Simple Avo did not allege the Thomas Fire was substantially caused by an inherent risk presented by the deliberate design, construction, or maintenance of the public improvement as required by *Oroville*.

### 1. *Standard of review*

"The standard of review for an order overruling a demurrer is de novo. The reviewing court accepts as true all facts properly pleaded in the complaint in order to determine whether the demurrer should be overruled. [Citation.] A general demurrer will lie where the complaint 'has included allegations that *clearly* disclose some defense or bar to recovery.'" (*Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 182-183; accord, *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1394.) A demurrer can be used only to challenge defects that appear on the face of the complaint or from matters outside the pleading that are judicially noticeable. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; *Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 994.) "To survive a demurrer, the complaint need only allege facts sufficient to state a cause of action." (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 872.) The demurrer admits the truth of all material facts properly pleaded, including all ultimate facts alleged, but not contentions, deductions or conclusions of fact or law. (See *290 Division (EAT), LLC v. City and County of San Francisco* (2022) 86 Cal.App.5th 439, 452.)

### 2. *Principles of inverse condemnation*

The California Supreme Court recently examined the principles underlying an inverse condemnation claim in *Oroville*.

21

"Under article I, section 19 of the California Constitution . . . a public entity must pay the owner just compensation when it takes or damages private property for public use." (*Oroville, supra,* 7 Cal.5th at p. 1102; see Cal. Const., art. I, § 19, subd. (a) ["Private property may be taken or damaged for a public use and only when just compensation . . . has first been paid to . . . the owner"].) This constitutional provision forms "the basis for two kinds of actions: a conventional eminent domain proceeding, instituted by a public entity to acquire private property for public use; and an inverse condemnation action, initiated by a private property owner seeking compensation for a taking or damage to his or her property." (*Oroville,* at p. 1102.)

The high court identified two competing concerns when setting the contours of inverse condemnation claims: "One is to pool the burden to the individual property owner and distribute throughout the community the losses resulting from the public improvement. [Citations.] Another is to mitigate concerns that 'compensation allowed too liberally will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost.'" (*Oroville, supra,* 7 Cal.5th at pp. 1103-1104.) Neither party contends the second concern—increased cost impeding public works—is implicated here.

> 3. *The master complaint sufficiently alleged SCE's liability for inverse condemnation as a public entity*

SCE contends inverse condemnation applies only to public entities and the master complaint, adopted by Simple Avo, alleges SCE is "a privately owned public utility," thereby defeating the inverse condemnation cause of action. Simple Avo, relying on *Barham* and *Pacific Bell,* asserts SCE may be considered a public entity for purposes of inverse condemnation.

22

We agree that our courts have not categorically limited inverse condemnation claims as SCE argues.

### a.    Barham *and* Pacific Bell

In *Barham*, the plaintiff landowners sued SCE for damages they sustained in a wildfire caused by a failure in SCE's overhead power line equipment.  (*Barham, supra,* 74 Cal.App.4th at p. 747.)  A jury awarded the landowners damages on their tort causes of action, but the trial court entered judgment for SCE on the inverse condemnation cause of action.  (*Ibid*.)  Both sides appealed.  Division Two of the Fourth Appellate District reversed the trial court's inverse condemnation ruling.  (*Id*. at p. 751.)

As in this case, SCE argued it was a privately-owned utility, not a public entity subject to inverse condemnation claims.  (*Barham, supra*, 74 Cal.App.4th at p. 752.)  The court rejected this argument, reasoning publicly-owned electrical utilities had been held liable in inverse condemnation in "virtually identical" circumstances and that, under the facts presented, there was no rational basis for distinguishing them from privately-owned utilities.  (*Id*. at p. 753.)  *Barham* expressly held that "SCE may be liable in inverse condemnation as a public entity."  (*Ibid*.)

*Barham* examined the California Supreme Court's analysis in *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 (*GLSA*).  There, the high court held a privately-owned utility "to whom the state has granted a monopoly over a significant segment of the telephonic communications industry in California" could be treated as a state actor subject to the Equal Protection clause when hiring employees.  (*Id*. at p. 468.)  The court found, "the nature of the California regulatory scheme

23

demonstrates that the state generally expects a public utility to conduct its affairs more like a governmental entity than like a private corporation." (*Id.* at p. 469.) The court further concluded, "we believe . . . that a public utility may not properly claim prerogatives of 'private autonomy' that may possibly attach to a purely private business enterprise."[12] (*Id.* at p. 470.)

In *Pacific Bell,* the plaintiff telephone company sued SCE for inverse condemnation. It alleged its telephone cables were damaged when a bird flew into a SCE power line, causing electricity to run down a utility pole to the underground trench holding its cables and SCE's power infrastructure. (*Pacific Bell, supra,* 208 Cal.App.4th at p. 1403.) After a bench trial, judgment

---

[12] SCE contends *GLSA* is limited to employment discrimination cases, citing *Pasillas v. Agricultural Labor Relations Board* (1984) 156 Cal.App.3d 312 (*Pasillas*) and *Automatic Sprinkler Corp. v. Southern California Edison Co.* (1989) 216 Cal.App.3d 627 (*Automatic Sprinkler*). We are unpersuaded. *Pasillas* merely found *GLSA* did not confer "state action" on a union with "monopoly" status pursuant to a state-authorized union security agreement. (*Pasillas,* at p. 348.) It questioned whether *GLSA* might have applicability beyond the employment discrimination context and particularly in the free speech context. (*Ibid.*) A different Court of Appeal responded in the affirmative in *Savage v. Pacific Gas and Electric Co.* (1993) 21 Cal.App.4th 434, 455-456, relying on *GLSA* to impose liability on privately-owned Pacific Gas and Electric Company for violations of the First Amendment and the Equal Protection clause of the United States Constitution. Nor did *Automatic Sprinkler* limit the scope of *GLSA*. There, the court merely concluded that, "It is readily seen that the issue, body of law, and subject matter of [*GLSA*] have no bearing or relationship to this case," which involved a payment bond for public works. (*Automatic Sprinkler,* at p. 633.)

was entered against SCE. (*Id.* at p. 1402.) On appeal, Division One of this District rejected SCE's private entity argument, agreeing with *Barham.* (*Id.* at p. 1404.)

*Pacific Bell* cited California Supreme Court precedent reflecting that inverse condemnation liability could be imposed on private entities. (*Pacific Bell, supra,* 208 Cal.App.4th at p. 1405.) For example, in *Breidert v. Southern Pacific Co.* (1964) 61 Cal.2d 659, the defendant railroad and a local city closed a railroad crossing, depriving the plaintiffs of access to a right-of-way. (*Id.* at p. 661.) The closure was authorized by an order of the CPUC. (*Id.* at p. 662.) The high court rejected the railroad's contention it was "not a proper party defendant" to the inverse condemnation case. (*Ibid.*) It reasoned that "[s]ince defendant railroad was an active joint participant in closing the crossing, it is a proper party to the present litigation." (*Ibid.*) *Pacific Bell* rejected SCE's narrow reading of *Breidert* and did not require joint participation with a government entity for liability to attach to SCE for an inverse condemnation claim: "While joint participation may certainly give rise to inverse condemnation liability, we do not believe it is required." (*Pacific Bell,* at p. 1405.)

*Pacific Bell* further observed the California Supreme Court had previously indicated a privately-owned utility could be liable for inverse condemnation in *Pettis v. General Telephone Co.* (1967) 66 Cal.2d 503 (*Pettis*). *Pettis* involved claims against two utilities to compel removal of utility lines. The defendant utilities argued the plaintiff was not entitled to injunctive relief or to quiet title against them because his property had been put to a public use and the public interest had intervened. (*Id.* at pp. 505, 507.) The high court agreed that if the defendants

25

established at trial the necessity of maintaining their utility lines through the plaintiff's property, then the plaintiff would be "relegated to the remedy of damages as in inverse condemnation." (*Id.* at p. 507.)

*Pacific Bell* also found *GLSA,* discussed above, and *Eachus v. Los Angeles etc. Ry. Co.* (1894) 103 Cal. 614 (*Eachus*), persuasive. In *Eachus,* the California Supreme Court affirmed an award of inverse condemnation damages against a privately owned railroad company. (*Eachus*, at pp. 622-623.) The city had granted the railroad company a franchise to construct a railroad in front of the plaintiffs' property. (*Id.* at p. 615.) *Pacific Bell* reasoned, "like *[GLSA]* the dispositive factor in *Eachus* appears to be the quasi-monopolistic authority and delegated power given to the defendant by the grant of a franchise" in determining whether a privately-held company could be held liable for inverse condemnation. (*Pacific Bell, supra,* 208 Cal.App.4th at p. 1407.)

*Pacific Bell* distinguished the facts before it from cases involving private parties who did not operate under a similar franchise from the state. (*Pacific Bell, supra,* 208 Cal.App.4th at p. 1407.) "Here, the government has chosen to grant a franchise and delegate the furnishing of electricity to Edison rather than operating the utility itself. Such a delegation does not remove the policy justifications underlying inverse condemnation liability: that [injured] individual property owners should not have to contribute disproportionately to the risks from public improvements made to benefit the community as a whole."[13] (*Ibid.*)

---

[13] SCE argues *Pacific Bell*'s reliance on the grant of monopoly powers to a private entity to justify inverse condemnation

26

SCE argued in *Pacific Bell*, as it does in this case, that the policy behind inverse condemnation was not met because it could not raise rates without the CPUC's approval. The court was not persuaded because there was no evidence the CPUC would not allow SCE to raise its rates to pass on damages liability. (See *Pacific Bell, supra,* 208 Cal.App.4th at p. 1407.) Additionally, the court observed "the Supreme Court has stated that, although the Legislature has chosen not to do so, nothing in the Constitution prevents the Legislature from placing municipally owned utilities under the regulations of the Public Utilities Commission, including regulation of rates. [Citation.] We do not believe such regulation would immunize municipal utilities from inverse condemnation liability under the theory that they were no longer able to spread the cost of public improvements." (*Id.* at p. 1407, fn. 6.)

### b. *SCE does not persuasively demonstrate why we should depart from* Barnham *and* Pacific Bell

The trial court followed the well-reasoned analysis in *Barham* and *Pacific Bell*. On appeal, SCE provides no persuasive reason to depart from their holdings.

---

liability would be misplaced in this case because SCE does not have the power to raise prices as a monopoly does. But, as outlined above, *Pacific Bell*'s analysis did not rest on a monopoly's power to raise prices; it knew SCE could not raise rates without CPUC authorization. *Pacific Bell* merely reasoned, as did the high court in *GLSA,* that a private company granted a franchise to operate like a governmental entity could be held liable under inverse condemnation as would a government entity. (*Pacific Bell, supra,* 208 Cal.App.4th at pp. 1406-1407.)

27

The master complaint in this case alleges SCE is "a privately owned public utility, which enjoys a state-protected monopoly or quasi-monopoly, derived from its exclusive franchise provided by the State of California and is more akin to a governmental entity than a purely private entity, and runs its utility affairs like a governmental entity. [SCE's] monopoly is guaranteed and safeguarded by the [CPUC], which possesses the power to refuse to issue certificates of public convenience and necessity to permit potential competition to enter the market. . . . Under the rules and regulations set forth by the [CPUC], amounts that SCE must pay in inverse condemnation can be included in [its] rates and spread among the entire group of rate payers so long as [it is] otherwise acting as a reasonable and prudent manager of [its] electric distribution systems." This is sufficient to allege SCE can be held liable for inverse condemnation.

We are not persuaded by SCE's attempts to distinguish or limit *Barham* and *Pacific Bell*. SCE's primary argument is that both cases are based on the incorrect assumption that SCE could pass on its losses to customers through rate increases. But, according to SCE, the 2017 CPUC decision involving SDG&E demonstrates that assumption is incorrect. SCE misreads *Barham* and *Pacific Bell*. Neither case assumed SCE had unfettered authority to raise rates and *Pacific Bell* expressly observed that SCE "may raise rates only with the approval of California's Public Utility Commission." (*Pacific Bell, supra*, 208 Cal.App.4th at p. 1407; see *Barham, supra,* 74 Cal.App.4th at pp. 751-753.)

Further, *Pacific Bell* rejected this same argument from SCE. *Pacific Bell* reasoned that even if the Legislature subjected municipal utilities to the same regulations as private utilities, "such regulation would [not] immunize municipal utilities from inverse condemnation liability under the theory that they were no longer able to spread the cost of public improvements." (*Pacific Bell, supra*, 208 Cal.App.4th at p. 1407, fn. 6.) SCE argues this was dicta based on an assumption that a municipality can spread losses through its taxation power. But *Pacific Bell* made no mention of a municipality's taxing powers and instead based its analysis on the well-established "policy justifications underlying inverse condemnation liability: that individual property owners should not have to contribute disproportionately to the risks from public improvements made to benefit the community as a whole." (*Id.* at p. 1407.)

In all events, the CPUC's 2017 decision regarding SDG&E did not demonstrate as a matter of law that the CPUC would also deny a rate increase to SCE in connection with the Thomas Fire such that the master complaint failed to state a claim for inverse condemnation. The trial court recognized that SCE was improperly inviting it to weigh a factual dispute on demurrer regarding the effect of the 2017 CPUC decision on any future request by SCE to the CPUC relating to the Thomas Fire. As the trial court correctly observed, "That alone dictates a decision to overrule the demurrer."

SCE cites no authority that disapproves, overrides, or even disagrees with *Barham* or *Pacific Bell*. SCE instead quotes from *Oroville, supra*, 7 Cal.5th at p. 1102 and *Paterno v. State of California* (1999) 74 Cal.App.4th 68 (*Paterno*), for the proposition that only a "public entity" may be liable for inverse

29

condemnation. Neither case considered whether a private entity may be treated as a public entity for purposes of inverse condemnation. The "public entity" language that SCE quotes from each case merely reflects that the defendant in those cases was a public entity. In *Oroville*, the defendant was the City of Oroville, and in *Paterno* the defendant was the State of California. (See *Oroville*, at p. 1097; *Paterno*, at p. 75.) A decision "does not stand for a proposition not considered by the court." (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 343; see *Gogri v. Jack in the Box Inc.* (2008) 166 Cal.App.4th 255, 272.)

We are also not persuaded that Simple Avo's position departs from the cost-spreading rationale underlying inverse condemnation to a "cost-shifting" one that burdens SCE alone with liability. Simple Avo's position rests almost entirely on *Barham* and *Pacific Bell*, which are established law that we follow. Further, to the extent SCE desires to spread its costs to utility users, it has the ability to seek a rate increase from the CPUC, and on demurrer we cannot conclude as a matter of law that the CPUC would deny such a request.

C.   *The Master Complaint Sufficiently Pleaded an Inverse Condemnation Claim After* Oroville

After the trial court overruled SCE's demurrer in 2018, the California Supreme Court issued its decision in *Oroville* in 2019, clarifying the substantial causation element of an inverse condemnation cause of action. *Oroville* explained that liability under inverse condemnation requires addressing "a fundamental question: whether the inherent risks associated with the [public improvement]—as deliberately designed, constructed, or maintained—were the substantial cause of the damage to the

private property." (*Oroville, supra,* 7 Cal.5th at p. 1098.) SCE argues Simple Avo cannot allege the inherent risk and substantial cause components. We conclude the master complaint sufficiently alleges both.

1. Oroville

In *Oroville,* the plaintiff dentists sued the city for inverse condemnation arising out of a sewer backup that caused sewage to spew from the toilets, sinks, and drains in plaintiffs' offices. The plaintiffs alleged the city's sewer system failed to function as intended. The city countered the damage occurred because the plaintiffs failed to install a legally-required backwater valve that would have prevented sewage from entering their building. (*Oroville, supra,* 7 Cal.5th at pp. 1097-1098.)

After denying the city's motion for summary judgment, the trial court made a judicial determination under Code of Civil Procedure section 1260.040 that the primary cause of the blockage in the sewer line and the backup was root intrusion, whereas the plaintiffs' failure to install the backwater valve was a secondary, but significant cause of damage.[14] Under these circumstances, the trial court found the city liable for inverse condemnation and the Court of Appeal affirmed. (*Oroville, supra,* 7 Cal.5th at p. 1099.)

---

[14] Code of Civil Procedure section 1260.040, subdivision (a), provides: "If there is a dispute between plaintiff and defendant over an evidentiary or other legal issue affecting the determination of compensation, either party may move the court for a ruling on the issue."

31

The California Supreme Court reversed.  It held that liability under inverse condemnation principles requires the damage to private property must be substantially caused by an inherent risk presented by the deliberate design, construction, or maintenance of the public improvement.  It disapproved *California State Automobile Assn. v. City of Palo Alto* (2006) 138 Cal.App.4th 474 (*Palo Alto*), relied upon by the trial court and Court of Appeal, on the ground that *Palo Alto* improperly required the city to prove that other forces (i.e., the failure to install the backwater valve) alone produced the injury.  (See *Oroville, supra,* 7 Cal.5th at p. 1101.)

The court explained, "The concepts of 'inherent risk' and 'substantial causation' address somewhat overlapping considerations but play distinct roles in the analysis of inverse condemnation.  And both must be present for a public entity to be liable."  (*Oroville, supra,* 7 Cal.5th at p. 1106.)

The court stated the "focus" of substantial causation was "on whether there is proof that the damages 'followed in the normal course of subsequent events' and were 'predominantly' produced by the improvement."  (*Oroville, supra,* 7 Cal.5th at p. 1108.)  "At the core of the test is the requirement that—even in the case of multiple concurrent causes—the injury to private property is an 'inescapable or unavoidable consequence' of the public improvement as planned and constructed."  (*Ibid.*)  Accordingly, the court rejected a strict liability standard for inverse condemnation claims.  (*Ibid.*)

*Oroville* further explained, "The inherent risk assessment—in line with the policy considerations underlying article I, section 19—avoids open-ended liability by protecting public entities from liability for private property damage that is

arguably connected to a public improvement but is not the result of the improvement's inherent risks." (*Oroville, supra,* 7 Cal.5th at p. 1106.) The court emphasized, "the 'inherent risk' aspect of the inverse condemnation inquiry is not limited to deliberate design or construction of the public improvement. It also encompasses risks from the maintenance or continued upkeep of the public work. [Citation.] A public entity might construct a public improvement and then entirely neglect any kind of preventive monitoring or maintenance for the improvement. [Citation.] If the public entity makes a policy choice to benefit from the cost savings from declining to pursue a reasonable maintenance program, for instance, inverse condemnation principles command 'the corollary obligation to pay for the damages caused when the risks attending these cost-saving measures materialize.' [Citation.] It may be sensible in some sense for a public entity to forgo regular monitoring and repair and instead adopt a 'wait until it breaks' plan of maintenance to save on the costs of imposing a monitoring system. But the damages that result from the inherent risks posed by the public entity's maintenance plan should be spread to the community that benefits from lower costs, instead of leaving property owners adversely affected by the public entity's choice to shoulder the burden alone." (*Id.* at p. 1107.)

*Oroville* concluded it was not enough for the trial court to find the primary cause of the sewage backup was root intrusion. Sewage backup was not an inherent risk of the city's sewer system as deliberately designed and constructed. Instead, the sewer system was deliberately designed to include the back-water valve, which the evidence showed would have significantly reduced the risk of invasion. (See *Oroville, supra,* 7 Cal.5th at

33

p. 1111.)  Thus, "[t]he backup of sewage into [the plaintiffs'] offices was not the necessary result or unavoidable consequence of any risk posed by the sewer system."  (*Ibid.*)

> 2.  *The master complaint satisfies* Oroville
> > a.  *Substantial causation*

Here, the master complaint alleged that SCE knew its infrastructure was old and improperly maintained for safety, yet it failed to properly assess and remediate these known risks, resulting in the Thomas Fire and other wildfires.  On December 4, 2017 SCE's electrical distribution system, including its power lines, conductors, electrical infrastructure and equipment and transformers "arced," igniting the Thomas Fire at two separate locations.  Although it had the authority to do so, SCE did not power down its electrical infrastructure before the Thomas Fire ignited, despite a "Red Flag Warning" of high winds and hazardous conditions.  The Thomas Fire burned more than 281,000 acres in Santa Barbara and Ventura Counties.  Simple Avo further alleged its property in Ventura was destroyed causing damage to its crops, structures, and loss of profits.  The master complaint concluded, "The above described damage to Plaintiffs' property was legally and substantially caused by the actions of SCE in their installation, ownership, operation, use, control, management, and/or maintenance of the electrical distribution system for a public use."

These allegations are sufficient to allege Simple Avo's damages were "substantially caused" by SCE's old and improperly maintained electrical distribution system.

34

We are not persuaded by SCE's argument that its own negligence is a concurrent cause of the Thomas Fire that absolves it of inverse condemnation liability. Seizing on one sentence in *Oroville* that states, "even in the case of multiple concurrent causes—the injury to private property [must be] an 'inescapable or unavoidable consequence' of the public improvement" (*Oroville, supra,* 7 Cal.5th at p. 1108), SCE contends the master complaint does not and cannot meet this "elevated" standard. According to SCE, the master complaint alleged SCE failed to act with reasonable care to maintain its safety equipment, supervise its employees, or manage the vegetation surrounding its equipment. The consequences of SCE's operation and maintenance of its electric utility (i.e., the Thomas Fire) were therefore escapable and avoidable if not for SCE's own negligence.

But *Oroville* expressly rejected this argument: "If damage to private property is substantially caused by the inherent risks of the design or construction of a public improvement, a public entity must provide just compensation for the damage, whether it was intentional or the result of negligence by the public entity." (*Oroville, supra,* 7 Cal.5th at p. 1106.) Accordingly, the master complaint sufficiently alleged SCE "substantially caused" the damage to Simple Avo's property.

### b. *Inherent risk*

Next, SCE contends the master complaint fails to plead an inherent risk in the deliberate design, construction or maintenance of its electric distribution system substantially caused Simple Avo's damages. The allegations in the master complaint show otherwise.

The master complaint alleges that SCE chose to forgo regular monitoring and repair of its aging electric infrastructure. In particular, that SCE failed to meet its own target metrics to inspect, assess, and remediate electrical poles that did not meet modern safety standards. SCE instead modified its software to recalculate pole safety factors and reduced the percentage of poles that need remediation to 9 percent from its original estimate of 22 percent. The master complaint identified other fires caused by SCE's electrical infrastructure as well as the fines assessed by the CPUC against SCE for prior safety violations. The master complaint further alleged, "SCE knew about the significant risk of wildfires from its ineffective vegetation management programs, unsafe equipment, and/or aging infrastructure for decades before the Thomas Fire." These allegations describe the "wait until it breaks" maintenance plan set out in *Oroville*.

As in *Oroville*'s hypothetical, SCE's failure to meet its targets to inspect, assess, and remediate poles benefits SCE in the form of cost savings. The complaint alleged SCE deliberately modified its software, which resulted in a significant reduction of the number of poles to be remediated. Because the master complaint alleged SCE made a choice to "declin[e] to pursue a reasonable maintenance program . . . inverse condemnation principles command 'the corollary obligation to pay for the damages caused when the risks attending these cost-saving measures materialize.'" (*Oroville, supra,* 7 Cal.5th at p. 1107.)

SCE contends there are no allegations it made a deliberate choice when it failed to meet its program goals, and that the allegations that it negligently failed to meet its own goals prevent inverse condemnation liability from attaching. We already

36

addressed and rejected SCE's negligence argument above. Further, at the pleading stage, the complaint sufficiently alleged facts that SCE chose to forgo regular monitoring and repair of its aging electric infrastructure.

Accordingly, the master complaint has adequately alleged the inherent risk in the deliberate design, construction or maintenance of its electric distribution system substantially caused Simple Avo's damages.

3. *The master complaint sufficiently alleges public use*

SCE argues that neither the Thomas Fire itself, nor any of the damage from the Thomas Fire, served "the public use"—a required element for inverse condemnation. SCE argues that such damage may give rise to an inverse condemnation only if the damage itself, rather than the public improvement, furthers the public use.

"'A public use is "a use which concerns the whole community as distinguished from a particular individual or a particular number of individuals."'" (*Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 381 (*Customer Co.*); see *City of Los Angeles v. Superior Court* (2011) 194 Cal.App.4th 210, 221.) "[G]enerally, condemning private property for the transmission of electrical power is a public use and inverse condemnation will apply." (*Barham, supra,* 74 Cal.App.4th at p. 752; see also *Hale v. Morgan* (1978) 22 Cal.3d 388, 400 [electrical service is a "vital" necessity to the public]; *Slemons v. Southern California Edison Co.* (1967) 252 Cal.App.2d 1022, 1026 ["Electric power lines for the transmission and distribution of electric energy are clearly a public use of property for eminent domain purposes."].)

*Cantu v. Pacific Gas & Electric Co.* (1987) 189 Cal.App.3d 160 (*Cantu*) is instructive.  There, the developer of a subdivision contracted with a utility company to provide electrical and gas service to the 16 lots within the subdivision.  (*Id.* at p. 162.)  The utility installed a trench within the subdivision to accommodate its electrical and gas lines.  (*Id.* at p. 163.)  Years later, during heavy winter rains, a landslide occurred in the subdivision, damaging the plaintiffs' home.  (*Ibid.*)  The plaintiffs sued the utility for inverse condemnation, alleging the utility's trench was a contributing cause of the landslide.  (*Ibid.*)  Following a bench trial, the court found the utility liable in inverse condemnation. (*Ibid.*)  The Court of Appeal reversed, ruling the utility facilities at issue were "for a private use and therefore inverse liability principles are inapplicable."  (*Id.* at p. 164.)

*Cantu* based its public use finding on two key circumstances.  First, that it "would be unfair" to impose inverse condemnation liability when "service was provided pursuant to a contract between the private developer and [the utility]" rather than by the utility's exercise of its eminent domain authority, which would reflect "an economic business decision to assume liability in the event damage to neighboring property is proximately caused by its improvement."  (*Cantu, supra,* 189 Cal.App.3d at pp. 164-165.)  Second, the court determined it was significant that the utility trench "was designed to fulfill an individual need" for a single subdivision and was not part of a larger system "designed to transmit electricity over a much greater area and which would exist even if these particular plaintiffs were not customers."  (*Ibid.*)  Because the utility facilities "did not benefit the public at large but [were] for the private use of the plaintiffs and their neighbors," the court

38

reasoned that imposing inverse condemnation liability would be inconsistent with the doctrine's underlying rationale that "the risks of injury [from public activity] should be spread over society." (*Id.* at p. 165.)

In *Barham*, by contrast, the power lines that caused the fires were part of a "circuit" that "provide[d] electric service to more than 1,000 households." (*Barham, supra*, 74 Cal.App.4th at p. 754.) Distinguishing *Cantu, Barham* concluded "the transmission of electric power through the facilities that caused damage to the [plaintiffs'] property was for the benefit of the public." (*Ibid.*) The same analysis applies here. The master complaint alleged the power lines that ignited the Thomas Fire were part of an electrical distribution system serving thousands of acres in Central, Coastal, and Southern California. Under *Barham,* the electric distribution system that caused damage to Simple Avo's property was for the public use.

We are not persuaded by *Customer Co., supra,* 10 Cal.4th at page 383, which SCE cites for the proposition that inverse condemnation liability arises only if the damage itself serves a public use. There, law enforcement, in the course of apprehending a felony suspect, fired teargas into the plaintiff's store, causing extensive property damage. (*Id.* at p. 371.) *Customer Co.* held that "an action for inverse condemnation does not lie in the present case to recover damages caused by the efforts of law enforcement officers to enforce the criminal laws." (*Ibid.*) The court reasoned, "the property damage for which Customer seeks to recover bears no relation to a 'public improvement' or 'public work' of any kind. Instead, the damage was caused by actions of public employees having 'no relation to the function' of a public improvement whatsoever." (*Id.* at

p. 383.) *Customer Co.* merely reinforces the rule that the public use element is tied to the public improvement, not the damage it causes.

SCE's other cases that it cites for the proposition that the public use requirement applies to the damage (e.g., the wildfire) rather than the public improvement (e.g., the electric distribution system) that caused the damage do not overcome the inverse condemnation analysis presented in *Barham, Cantu,* and *Customer Co.*[15]

Our ruling that the master complaint sufficiently alleges a cause of action for inverse condemnation, of course, is not a ruling that SCE is liable on that cause of action. As the trial court noted, SCE's argument regarding the purported effect of the 2017 CPUC decision on its ability to spread its losses through a rate increase identifies a potential factual issue that cannot be resolved on demurrer. The CPUC may come to a different conclusion as to SCE and the Thomas Fire, a matter on which we will not speculate and offer no view.

---

[15] See, e.g., *Reardon v. San Francisco* (1885) 66 Cal. 492; *Western Assurance Co. v. Sacramento & San Joaquin Drainage District* (1925) 72 Cal.App. 68; *Miller v. City of Palo Alto* (1929) 208 Cal. 74; *Hayashi v. Alameda County Flood Control & Water Conservation District* (1959) 167 Cal.App.2d 584.

## DISPOSITION

The judgment and order denying the demurrer are affirmed.  Simple Avo is to recover its costs on appeal.


MARTINEZ, P. J.

We concur:



SEGAL, J.



FEUER, J.

41